**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

AMERICAN EXPRESS TRAVEL :
RELATED SERVICES COMPANY, INC. :
                 Plaintiff, :

    *– against –* :

:
VISA U.S.A. INC., :
VISA INTERNATIONAL SERVICE :
ASSOCIATION, :
MASTERCARD INCORPORATED, :
MASTERCARD INTERNATIONAL INC., :
BANK ONE, DELAWARE, N.A., :
BANK ONE CORPORATION, :
CHASE MANHATTAN BANK USA, N.A., :
JPMORGAN CHASE & CO., :
FLEET BANK (RI), N.A., :
FLEET NATIONAL BANK, :
BANK OF AMERICA, N.A., :
BANK OF AMERICA CORPORATION, :
CAPITAL ONE BANK, :
CAPITAL ONE F.S.B., :
CAPITAL ONE FINANCIAL CORP., :
U.S. BANK, N.A., :
U.S. BANCORP, :
HOUSEHOLD BANK, N.A., :
HOUSEHOLD INTERNATIONAL INC. :
WELLS FARGO BANK (ARIZONA), N.A., :
WELLS FARGO FINANCIAL NATIONAL :
BANK, :
WELLS FARGO FINANCIAL, INC., :
WELLS FARGO & COMPANY, :
PROVIDIAN FINANCIAL CORP. :
PROVIDIAN NATIONAL BANK, :
USAA FEDERAL SAVINGS BANK, :
               Defendants :

---------------------------------------------------------x

**COMPLAINT AND**
**JURY DEMAND**

**04 No. CV 08967**

**ECF Case**



RECEIVED
NOV 1 5 2004
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff American Express Travel Related Services Company, Inc., a wholly owned

subsidiary of American Express Company (together, "American Express"), by its undersigned

1

counsel, for this Complaint alleges, with knowledge of American Express' own acts and acts taking place in its presence, and upon information and belief as to all other matters, as follows:

## I. SUMMARY OF THE ACTION

1.      This action arises out of the same course of anticompetitive conduct held to violate Section 1 of the Sherman Act in United States v. Visa USA, et al., 163 F. Supp. 2d 322 (S.D.N.Y. 2001), aff'd, 344 F.3d 229 (2d Cir. 2003), cert. denied, 125 S.Ct. 45 (2004). In that case, this Court found that the Visa and MasterCard associations, together with their member banks, implemented and enforced illegal exclusionary agreements requiring any U.S. bank that issues Visa or MasterCard general purpose cards to refuse to issue American Express and Discover cards. 163 F. Supp. 2d at 405-06.

2.      Defendants' antitrust violations have harmed the market in which the card networks provide authorization, clearance, and settlement services for general purpose card payment transactions (the "general purpose card network services market" or "network services market"), as well as the market in which credit and charge cards are issued (the "general purpose credit and charge card market," "general purpose card market," or "card issuing market"). Through "the total exclusion of American Express ... from a segment of the market for network services," 344 F.3d at 240, the conspiracy participants "seriously damaged" competition at the network level, id., and have "significantly reduced product output and consumer choice in the issuing market." 163 F. Supp. 2d at 330. Defendants' anticompetitive boycott of American Express has also foreclosed American Express from a "huge portion" of the network services market, id. at 382; restricted the output of American Express cards in the United States, id. at 329, 379, 387; restrained American Express' transaction volume, merchant acceptance levels, competitive vitality, and market share, id. at 329, 379, 382; and hampered American Express'

2

ability to develop and market new card features and network capabilities, id. at 329. In addition, as set forth below, Defendants' violations have restrained competition in the markets in which debit cards are issued and in which debit card network services are provided.

3.     Accordingly, in declaring Defendants' exclusionary rules illegal, this Court held that the "exclusionary rules undeniably reduce output and harm consumer welfare," that Visa and MasterCard had "offered no persuasive procompetitive justification for them," that "the member banks agreed not to compete by means of offering American Express and Discover branded cards," that "[s]uch an agreement constitutes an unreasonable horizontal restraint [that] cannot be permitted," and that "these rules constitute agreements that unreasonably restrain interstate commerce in violation of Section 1 of the Sherman Act." Id. at 405-06. The United States Court of Appeals for the Second Circuit unanimously affirmed. See 344 F.3d at 238-44.

4.     This case involves the same collusive conduct and exclusionary rules, committed by the same actors, motivated by the same anticompetitive purposes, and resulting in the same injuries.

5.     Visa and MasterCard are owned and operated by approximately 20,000 banks and other financial institutions, 344 F.3d at 242, many of which are members of both associations. 163 F.Supp. 2d at 346-47. As this Court found, the member banks were instrumental in adopting and carrying out the unlawful exclusionary agreements: the exclusionary rules were "restrictions *of, by and for the member banks*," 163 F. Supp. 2d at 400 (emphasis added); "there is substantial evidence that by adopting and enforcing the exclusionary rules, *the member banks agreed not to compete* by means of offering American Express and Discover branded cards," id. at 405 (emphasis added); the MasterCard banks adopted the same exclusionary rule as Visa's in order "to avoid loss of market share *by the two networks that the members own*," id. at 401 (emphasis

3

added); and the "motives" of the conspiring banks in the Visa and MasterCard associations were "to restrict competition at the network and issuer levels *to enhance member bank profitability*." Id. (emphasis added).

6. In affirming this Court's "comprehensive and careful opinion," 344 F.3d at 234, the United States Court of Appeals for the Second Circuit underscored the crucial role played by the member banks in agreeing to, and abiding by, the Visa and MasterCard versions of the exclusionary rules: "Visa U.S.A. and MasterCard, however, are not single entities; they are consortiums of competitors. They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions. *These 20,000 banks set the policies of Visa U.S.A. and MasterCard. These competitors have agreed to abide by a restrictive exclusivity provision to the effect that in order to share the benefits of their association by having the right to issue Visa or MasterCard cards, they must agree not to compete by issuing cards of Amex or Discover. The restrictive provision is a horizontal restraint adopted by 20,000 competitors.*" Id. at 242 (emphasis added). Thus, "the restraint imposed by the consortium members [the member banks] is on themselves. *Each has agreed not to compete with the others in a manner which the consortium considers harmful to its combined interests.*" Id. (emphasis added).

7. Defendants' anticompetitive conduct began at least as early as 1991, with the adoption of Visa's exclusionary rule, Visa U.S.A. by-law 2.10(e). That rule singles out American Express and Discover, providing for the automatic termination of any Visa bank member that issues any cards of either of those competing networks in the United States. Because Visa's member banks have a strong financial interest in MasterCard (as well as Diners Club, which is owned by a bank that is a member of both Visa and MasterCard, and JCB), Visa's

4

rule permits every Visa issuing bank also to issue cards on those networks. The Visa exclusionary rule maintained the networks' collective grip on bank card issuers and network services for several years.

8.     By the mid-1990s, however, American Express began to pursue card-issuing relationships, both in the United States and abroad. Outside of the United States, where there were no exclusionary rules to prevent competition, American Express successfully enlisted numerous foreign bank issuers. Those banks have issued millions of American Express cards.

9.     Meanwhile, in the United States, the banks' interest in issuing American Express cards was mounting. In May 1996, American Express' CEO, Harvey Golub, sparked a flood of interest from U.S. banks when, in a speech to the Credit Card Forum, he publicly invited those banks to issue American Express cards and outlined for them the compelling business case for American Express issuance. Immediately after that speech, a number of U.S. banks entered into serious discussions with American Express about forming card-issuing relationships.

10.     The associations and their member banks, including the Bank Defendants, recognized this surge of competitive momentum from American Express as a serious threat to their profits and control over the network services market. They feared that American Express' relationships with foreign bank issuers would quickly enhance American Express' competitiveness throughout the world, and believed that American Express' domestic overtures would imminently result in card-issuing relationships with a number of U.S. banks. Internal association documents warned that "bank partners could significantly increase [American Express'] acceptance and cards," 163 F.Supp. 2d at 397, and threaten member banks' profits.

11.     In a swift and comprehensive response to this threat, Defendants conspired to extend and reinforce their exclusionary rules in order to prevent American Express from

5

competing for bank partners and to ensure that banks did not compete with each other on the basis of partnerships with American Express.

12.     First, Visa International acted to adopt a global exclusionary rule patterned after Visa U.S.A. by-law 2.10(e), in order to stifle competition from American Express in Europe. After European competition authorities quashed those plans, in June 1996, Visa International's Board delegated the authority to enact such restraints to Visa's regional boards, including Visa U.S.A., thereby encouraging the adoption of such rules in foreign countries, communicating to co-conspirators its support for Visa U.S.A.'s exclusionary rule, and signaling the intent of the Visa and MasterCard member banks to complement Visa's exclusionary rule with a parallel MasterCard rule.

13.     Just three weeks later, and less than two months after CEO Golub's pivotal Credit Card Forum speech, the colluding banks, including bank members of Visa, shut the door on competition from American Express by causing MasterCard to adopt an exclusionary rule that is identical in purpose and effect to Visa's rule. Just like Visa's by-law 2.10(e), MasterCard's "Competitive Programs Policy" (or "CPP") precludes any U.S. bank that issues MasterCard cards from also issuing American Express cards, but permits such banks to issue Visa cards.

14.     The colluding banks passed MasterCard's CPP to protect and extend, for their own financial benefit, the Visa and MasterCard networks' stranglehold on the bank issuers of credit and charge cards and on the network services market. For example, Defendant Chase's representative to the MasterCard Board, who voted for the exclusionary rule, was "absolutely adamant" that the MasterCard rule was needed to protect both Visa and MasterCard, in which Chase had virtually equal shares, and to "send a signal to the American Banking community."

6

15.     Defendants' collusion has had its intended effect of preventing American Express from effectively competing with Visa and MasterCard for banks to issue its payment cards. Despite American Express' extensive efforts during the past decade, not a single U.S. bank, including each of the Bank Defendants, was willing to issue American Express cards. Until this year, American Express was not even able to sign as issuers any of the banks that expressed interest in issuing American Express cards, including those that objected to MasterCard's exclusionary rule before agreeing to participate in the collusive bank boycott of American Express.

16.     By precluding American Express from competing for bank issuers, Defendants have harmed competition and consumers, and have directly caused billions of dollars in losses to American Express' business and property. As the United States Court of Appeals for the Second Circuit found, "competition has been seriously damaged" at the network services level by Defendants' exclusionary rules, and "[t]he most persuasive evidence of harm to competition is the total exclusion of American Express and Discover from a segment of the market for network services." 344 F.3d at 240. Among other things, Defendants' conspiracy has deprived American Express of the substantial profits that it would have earned from providing authorization, clearance, and settlement services ("network services") for purchases made on bank-issued American Express cards. The resulting injury to American Express is precisely the type the antitrust laws are intended to prevent.

17.     Accordingly, Plaintiff American Express brings this action for treble damages and injunctive relief under Sections 4 and 15 of the Clayton Act (15 U.S.C. §§ 15, 26) for Defendants' violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).

## II. **THE PARTIES**

**A.** **Plaintiff**

18.     Plaintiff American Express Travel Related Services Company, Inc. ("TRS") is a corporation organized under the laws of the State of New York, with its principal place of business in New York, New York. TRS issues general purpose cards and, through its division American Express Global Network Services, operates the American Express general purpose card network and develops and maintains relationships with third-party banks and other financial institutions to issue cards that are accepted on the American Express general purpose card network.

19.     TRS is a wholly owned subsidiary of American Express Company. American Express Company is a corporation organized under the laws of the State of New York with its principal place of business in New York, New York. Plaintiff TRS and American Express Company are referred to collectively herein as "American Express."

20.     American Express issues credit and charge cards with its own brand name and provides general purpose card network services for U.S. credit and charge card transactions. Outside the United States, American Express also issues credit and charge cards with its own brand name and provides general purpose card network services for credit and charge card transactions through contractual arrangements with bank issuers of American Express general purpose cards. The conspiracies alleged herein have prevented American Express from entering similar arrangements with bank issuers in the United States.

21.     Since at least the mid-1990s, American Express has been the principal competitor to the Visa and MasterCard networks in the provision of general purpose card network services for U.S. credit and charge card transactions.

8

## B.    Defendants

### *Association Defendants*

22.    Defendants Visa U.S.A. ("Visa U.S.A.") and Visa International Service Association ("Visa International") are associations of independent banks and financial institutions and are structured as membership corporations.

23.    Defendants Visa U.S.A. and Visa International are organized under the laws of the State of Delaware, and each has its principal place of business in Foster City, California.

24.    Although Visa International has delegated certain authority to regional boards, including the Board of Directors of Visa U.S.A., Visa International retains ultimate authority over the policies and practices of Visa U.S.A., even for matters solely within the United States. Visa International has the ultimate authority to preempt or regulate application of Visa U.S.A. by-law 2.10(e).

25.    Visa U.S.A., Visa International, and all of their respective predecessors and subsidiaries are referred to collectively herein as "Visa."

26.    Defendant MasterCard Incorporated was formed as a private stock corporation in June 2002. MasterCard Incorporated is organized under the laws of the State of Delaware, and has its principal place of business in Purchase, New York. MasterCard Incorporated was formed through a process by which Defendant MasterCard International Incorporated ("MasterCard International") converted from a membership association to a private stock corporation.

27.    Before that conversion, MasterCard International was structured as a membership corporation and had operated as an association of independent banks and other entities. Through the conversion, MasterCard International's principal members received shares in MasterCard

9

Incorporated, a new holding company, and a membership interest in MasterCard International, MasterCard Incorporated's principal operating subsidiary.

28.     MasterCard Incorporated, MasterCard International, and all of their respective predecessors and subsidiaries are referred to collectively herein as "MasterCard."

29.     Visa and Mastercard are both "consortiums of competitors" consisting of thousands of banks that are members of both associations, "own[ ] and effectively operate[ ]" both associations, "set the policies of the [associations]," 344 F.3d at 242, and "agree to abide by their association's by-laws and other regulations," id. at 235.

### *Bank Defendants*

30.     Defendants Chase Manhattan Bank USA, N.A., a New York bank with its principal place of business in New York, New York; Bank One, Delaware, N.A., a national banking association with its principal place of business in Chicago, Illinois; and Bank One Corporation, a corporation organized under Delaware law with its principal place of business in Chicago, Illinois, are all wholly owned subsidiaries of Defendant JPMorgan Chase & Co., a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York.  Defendants Bank One, Delaware, N.A., Bank One Corporation, Chase Manhattan Bank USA, N.A., and JPMorgan Chase & Co. are referred to collectively herein as "Chase."

31.     Chase is a member of both Visa and MasterCard.  Chase was a member of the Visa U.S.A. Board of Directors in 1991 when Visa U.S.A. adopted its exclusionary rule, by-law 2.10(e), and was a member of the MasterCard Board of Directors in 1996 when MasterCard adopted its exclusionary rule, the CPP.

10

32.     Chase is the successor-in-interest to Chemical Bank/Manufacturers Hanover, which was also a member of the Visa U.S.A. Board of Directors in 1991 when Visa adopted by-law 2.10(e). Chase is also a successor-in-interest to First Chicago, which was a member of the Visa U.S.A. Board of Directors in 1991 when Visa U.S.A. adopted its exclusionary rule, by-law 2.10(e).

33.     Chase has agreed to abide by, has abided by, and has taken actions to adopt and/or extend Visa by-law 2.10(e) and MasterCard's CPP.

34.     Defendants Bank of America, N.A., a national banking association with its principal place of business in Charlotte, North Carolina; Fleet National Bank, a national bank with its principal place of business in Providence, Rhode Island; and Fleet Bank (RI), N.A., a national bank with its principal place of business in Providence, Rhode Island are wholly owned subsidiaries of Defendant Bank of America Corporation, a corporation organized under the laws of the State of Delaware with its principal place of business in Charlotte, North Carolina. Defendants Fleet National Bank, Fleet Bank (RI), N.A., Bank of America, N.A., and Bank of America Corporation are referred to collectively herein as "Bank of America."

35.     Bank of America is a member of both Visa and MasterCard. Bank of America was a member of the Visa U.S.A. Board of Directors in 1991 when Visa U.S.A. adopted its exclusionary rule, by-law 2.10(e), and was a member of the Visa International Board of Directors in 1996 when Visa International voted for a delegation of authority to regional Visa boards to enact restraints patterned after by-law 2.10(e).

36.     Bank of America is the successor-in-interest to Boatmen's Bancshares. Boatmen's Bancshares was a member of the MasterCard Board of Directors in 1996 when MasterCard adopted its exclusionary rule, the CPP. Bank of America is also the successor-in-

11

interest to NationsBank, which was a member of the Visa Board of Directors from 1990-1997, and Barnett Bank, which was a member of the Visa Board of Directors from 1990-1996.

37.     Bank of America has agreed to abide by, has abided by, and has taken actions to adopt and/or extend Visa by-law 2.10(e) and MasterCard's CPP.

38.     Defendants Capital One Bank, a Virginia bank with its principal place of business in Glen Allen, Virginia, and Capital One F.S.B, a national bank with its principal place of business in McLean, Virginia, are wholly owned subsidiaries of Defendant Capital One Financial Corporation, a corporation organized under the laws of the State of Delaware with its principal place of business in McLean, Virginia. Capital One Bank, Capital One F.S.B, and Capital One Financial Corporation are referred to collectively herein as "Capital One."

39.     Capital One is a member of both Visa and MasterCard. Capital One was a member of the MasterCard Board of Directors in 1996 when MasterCard adopted its exclusionary rule, the CPP.

40.     Capital One has agreed to abide by, has abided by, and has taken actions to adopt and/or extend Visa by-law 2.10(e) and MasterCard's CPP.

41.     Defendant U.S. Bank, N.A., a national banking association with its principal place of business in Fargo, North Dakota, is a wholly owned subsidiary of Defendant U.S. Bancorp, a corporation organized under the laws of the State of Delaware with its principal place of business in Minneapolis, Minnesota. U.S. Bank, N.A. and U.S. Bancorp are referred to collectively herein as "U.S. Bancorp."

42.     U.S. Bancorp is a member of both Visa and MasterCard. U.S. Bancorp is the successor-in-interest to Firstar and Colorado National Bankshares. Firstar was a member of the MasterCard Board of Directors in 1996 when MasterCard adopted its exclusionary rule, the CPP.

12

Colorado National Bankshares was a member of the Visa International Board of Directors in 1996 when Visa International voted for a delegation of authority to regional Visa boards to enact restraints patterned after Visa U.S.A. by-law 2.10(e).

43.     U.S. Bancorp has agreed to abide by, has abided by, and has taken actions to adopt and/or extend Visa by-law 2.10(e) and MasterCard's CPP.

44.     Defendants Household Bank, N.A., a national banking association with its principal place of business in Las Vegas, NV, and Household International, Inc., a corporation organized under the laws of the State of Delaware with its principal place of business in Prospect Heights, Illinois, are wholly owned subsidiaries of HSBC Holdings plc. Household Bank, N.A., Household International, Inc., and HSBC Holdings plc are referred to collectively herein as "Household."

45.     Household is a member of both Visa and MasterCard. Household was a member of the MasterCard Board of Directors in 1996 when MasterCard adopted its exclusionary rule, the CPP, and Marine Midland Bank, an affiliate of Household's that is also wholly owned by HSBC Holdings plc, was a member of the Visa U.S.A. Board of Directors in 1991 when Visa U.S.A. adopted its exclusionary rule, by-law 2.10(e).

46.     Household has agreed to abide by, has abided by, and has taken actions to adopt and/or extend Visa by-law 2.10(e) and MasterCard's CPP.

47.     Defendants Wells Fargo Bank (Arizona), N.A., a national banking association with its principal place of business in Concord, CA; Wells Fargo Financial National Bank, a national banking association with its principal place of business in Des Moines, Iowa; and Wells Fargo Financial, Inc., a corporation organized under the laws of the State of Iowa with its principal place of business in Des Moines, Iowa, are wholly owned subsidiaries of Defendant

Wells Fargo & Company, a corporation organized under the laws of the State of Delaware with its principal place of business in San Francisco, California. Wells Fargo Bank (Arizona), N.A., Wells Fargo Financial National Bank, Wells Fargo Financial, Inc., and Wells Fargo & Company are referred to collectively herein as "Wells Fargo."

48. Wells Fargo is a member of both Visa and MasterCard. Wells Fargo was a member of the MasterCard Board of Directors in 1996 when MasterCard adopted its exclusionary rule, the CPP. Wells Fargo is the successor-in-interest to Norwest Bank, which served on the Visa Board of Directors in 1991 and 1996.

49. Wells Fargo has agreed to abide by, has abided by, and has taken actions to adopt and/or extend Visa by-law 2.10(e) and MasterCard's CPP.

50. Defendant Providian National Bank, a national banking association with its principal place of business in Tilton, New Hampshire, is a wholly owned subsidiary of Defendant Providian Financial Corporation, a corporation organized under the laws of the State of Delaware with its principal place of business in San Francisco, California. Providian National Bank and Providian Financial Corporation are referred to collectively herein as "Providian."

51. Providian is a member of both Visa and MasterCard. Providian was a member of the MasterCard Board of Directors in 1996 when MasterCard adopted its exclusionary rule, the CPP.

52. Providian has agreed to abide by, has abided by, and has taken actions to adopt and/or extend Visa by-law 2.10(e) and MasterCard's CPP.

53. Defendant USAA Federal Savings Bank ("USAA"), a federal savings association with its principal place of business in San Antonio, Texas, is a wholly owned subsidiary of United Services Automobile Association.

14

54. USAA is a member of both Visa and MasterCard. USAA was a member of the MasterCard Board of Directors in 1996 when MasterCard adopted its exclusionary rule, the CPP.

55. USAA has agreed to abide by, has abided by, and has taken actions to adopt and/or extend Visa by-law 2.10(e) and MasterCard's CPP.

56. Defendants Chase, Bank of America, Capital One, U.S. Bank, Household, Wells Fargo, Providian, and USAA are referred to collectively herein as the "Bank Defendants."

### III. CO-CONSPIRATORS

57. Certain individuals, financial institutions, and other entities that are not named as defendants in this Complaint also participated as co-conspirators in the violations alleged and performed acts and made statements during and in furtherance thereof.

58. Defendants' co-conspirators include, among others, those banks and other entities that, in addition to the Bank Defendants, have been the members and owners of Visa and MasterCard during the period covered by this Complaint as well as the individuals who have exercised actual, implied or apparent decision-making authority on behalf of those banks and other entities.

59. The acts charged in the Complaint as having been performed by Defendants and their co-conspirators, including the Bank Defendants and other member banks, were authorized, ordered, or performed by their directors, officers, agents, employees, or representatives, while engaged in their employment or business duties and acting within the scope of their actual, implied or apparent authority.

60. In addition, the acts charged in this Complaint as having been performed by the Bank Defendants and other member banks of Visa and MasterCard as co-conspirators were

performed within the scope of their duties to Visa and/or MasterCard and with the actual, implied or apparent authority of Visa and/or MasterCard.

## IV. **JURISDICTION AND VENUE**

61.     Plaintiff brings this action under Sections 4 and 15 of the Clayton Act (15 U.S.C. §§ 15, 26). This Court has subject-matter jurisdiction over this Complaint under 28 U.S.C. §§ 1331, 1337(a).

62.     The acts and transactions constituting violations alleged herein occurred in the Southern District of New York and elsewhere. Moreover, Defendants maintain offices, transact business, and/or are found within this District. Accordingly, this Court has personal jurisdiction over each Defendant, and venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b).

## V. **TRADE AND COMMERCE**

63.     Throughout the period covered by this Complaint, Visa and MasterCard have operated general purpose and debit card networks and have provided general purpose card network services throughout the United States. Through their member banks, Visa and MasterCard have also issued payment cards that affect a substantial amount of interstate commerce.

64.     The member banks of Visa and MasterCard, including the Bank Defendants, issue credit, charge, and debit cards to consumers throughout the United States. Those cards affect a substantial amount of commerce throughout the United States. The member banks, including the Bank Defendants, issue most of their cards to domestic cardholders, who in turn use those cards to conduct transactions primarily within the United States.

16

## VI. **FACTUAL BACKGROUND**

### A.    The Relevant Markets

65.    Defendants' antitrust violations have occurred in the market in which the card networks provide authorization, clearance, and settlement services for general purpose card payment transactions in the United States. Through those violations, Defendants have harmed competition in, among other markets, the general purpose card network services market and the general purpose credit and charge card market, the market in which banks issue general purpose credit and charge cards to consumers in the United States.

### *The General Purpose Card Market*

66.    General purpose cards are payment devices that a consumer may use to make purchases from merchants unrelated to the card issuer without accessing or reserving the consumer's funds at the time of the purchase.

67.    There are two different types of general purpose cards: (i) credit cards, which generally permit the cardholder to pay only a portion of the balance due on his account within a set period after receiving his billing statement; and (ii) charge cards, which generally require the cardholder to pay the entire balance due on his account within a set period after receiving his billing statement. Credit and charge cards are reasonably interchangeable for each other, and are easily and readily substituted for each other by consumers.

68.    General purpose cards do not include cards that can only be used at a single merchant (*e.g.*, proprietary store cards) or cards that promptly access funds on deposit in a checking or savings account (*e.g.*, debit cards).

69.    General purpose cards are issued to consumers by, among others, Visa and MasterCard member banks, including the Bank Defendants, and American Express.

17

70. The general purpose credit and charge card market is the market in which the issuers of general purpose cards compete for customers who use those cards. In the United States, American Express competes for customers in the general purpose card market with, among others, bank issuers of Visa and MasterCard cards, including the Bank Defendants.

71. The general purpose credit and charge card market is referred to herein as "the general purpose credit and charge card market," the "general purpose card market," or the "card issuing market," and is a distinct "Relevant Product Market."

### The General Purpose Card Network Services Market

72. General purpose card network services include the infrastructure and mechanisms through which general purpose card transactions are conducted, such as the authorization, settlement, and clearance of transactions.

73. In the United States, the principal competitors in the general purpose card network services market are Visa, MasterCard, American Express, and Discover.

74. The banks and entities that issue cards and/or provide card acceptance services rely on general purpose card network services to perform certain core functions with respect to the cards they issue that cannot be replicated efficiently by other sources, including:

      a.     inventing, developing, and implementing infrastructure, systems, and technologies, including those that authorize and settle card transactions and reduce fraud;

      b.     defining, controlling, and promoting merchant acceptance of card brands;

      c.     developing and implementing rules and standards that govern card networks;

18

d.  setting fees and assessments for use of the network's products and services, including, directly or indirectly, the "merchant discount" rate (the amount subtracted from what a merchant ultimately receives for a general purpose card transaction); and

e.  inventing, developing, and implementing innovations to general purpose card features and functionalities.

75.  The "general purpose card network services market" or "network services market" is a distinct "Relevant Product Market."

### The Relevant Geographic Market

76.  Almost all of the general purpose cards issued by banks based in the United States are issued to domestic cardholders, who in turn use the cards for transactions chiefly within the United States. Accordingly, general purpose card network systems must have a national card base and national merchant acceptance networks in order to compete.

77.  Moreover, card issuers, which are the buyers of general purpose card network services, also compete at the national level.

78.  The United States is the relevant geographic market for each of the Relevant Product Markets alleged herein. (The general purpose card and general purpose card network services markets in the United States are referred to collectively herein as the "Relevant Markets.").

### B.  Market Power

79.  Visa and MasterCard, jointly and separately, have and exercise market power in the general purpose card network services market.

80.     As the two largest general purpose card networks in the United States, Visa and MasterCard dominate the general purpose card network services market. For example, in 1999, Visa and MasterCard together controlled over 73 percent of the dollar volume of general purpose card transactions in the United States; Visa's share was approximately 47 percent, and MasterCard's share was approximately 26 percent. In terms of general purpose cards issued in 1999, Visa and MasterCard controlled approximately 85 percent of the market.

81.     The general purpose card network services market has significant barriers to entry. The cost of establishing a network and developing a brand name is extraordinarily high. Moreover, prospective general purpose card network services competitors are faced with a "chicken-and-egg" problem of developing merchant acceptance without an initial network of cardholders who, in turn, are needed to induce merchants to accept cards in the first place. Indeed, no company has entered the general purpose card network services market since Discover (in 1985).

82.     Visa and MasterCard have exercised market power in the general purpose card network services market. Because significant numbers of customers would not shop at merchants who do not accept their general purpose cards, merchants would be forced to accept Visa and MasterCard even in the face of significant price increases. In recent years, Visa and MasterCard have raised the interchange rates they charge to merchants several times without losing merchant customers. In fact, the Visa and MasterCard networks have continued to expand their merchant acceptance rates notwithstanding these interchange rate increases.

83.     Moreover, Visa and MasterCard "have demonstrated their power in the network services market by effectively precluding their largest competitor [American Express] from

successfully soliciting any bank as a customer for its network services and brand." 344 F.3d at 240.

84.     Although card issuers may compete on interest rates, fees, enhancements, and customer service at the issuer level, such competition cannot replace the value of competition at the general purpose card network services level. Competition at the issuer level cannot cure the harms to consumers (described herein) arising from stifled competition among general purpose card network service providers. Nor does issuer-level competition prevent Visa and MasterCard from exercising power in the general purpose card network services market.

## C.     The Bank Defendants' and Member Banks' Control Over Visa and MasterCard

85.     "Visa U.S.A. and MasterCard . . . are not single entities; they are consortiums of competitors. They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions. These 20,000 banks set the policies of Visa U.S.A. and MasterCard." 344 F.3d at 242. Through membership in these associations, banks become entitled to issue the cards of the association and/or offer acceptance services for the association's cards. In exchange for the right to issue an association's cards and acquire its card transactions from merchants, these banks agree to abide by the by-laws, rules, regulations, and policies of that association.

86.     Consistent with their ownership and structure, Visa and MasterCard exist to serve the interests of the Bank Defendants and other member banks, and the members of Visa and MasterCard "work together through each of the associations to achieve benefits for themselves they could not provide independently . . . ." 163 F. Supp. 2d at 332. Visa and MasterCard are financed through fees and assessments levied on their member banks; these fees are set to cover the costs of providing the basic infrastructure to the networks' members. The Bank Defendants,

like all member banks of the Visa and MasterCard networks, do not pay license fees or royalties, but earn substantial profits as issuers of Visa and MasterCard payment cards and acquirers of merchant transactions.

87.     The networks' operations are conducted primarily by their member banks. The Bank Defendants and other Visa and MasterCard member banks control the networks to serve their financial interests. The Bank Defendants account for a substantial share of all the cards issued in the United States, are members of both associations, agree to abide by all association by-laws and rules as a condition of their memberships, and issue substantial percentages of their cards on each network. The Bank Defendants play key decision-making roles in both networks.

88.     The membership and ownership of the Visa and MasterCard networks are almost identical, and there is a virtually complete overlap between the networks' card-issuing members. As MasterCard's own "Competitive Programs Policy" recognizes, Visa and MasterCard are "essentially owned by the same member entities." Each of the Bank Defendants is a member of both Visa and MasterCard. The card-issuing portfolios of the large Visa and MasterCard banks, including the Bank Defendants, have included and continue to include substantial shares of each card. Of the combined Visa and MasterCard outstanding credit balances held by the top 100 issuing banks, approximately 99% is accounted for by banks that are issuing members of both Visa and MasterCard.

89.     Visa and MasterCard are each governed by a Board of Directors. The Visa and MasterCard Boards are elected by their respective member banks and determine the networks' overall strategic policies and direction. Each Board delegates certain authority to the network's management, which runs the network's day-to-day operations. Visa and MasterCard have also created advisory committees that have exercised de facto governing authority over issues before

22

them. For example, MasterCard's Business Committee and Visa's Marketing Advisors Committee advise their respective networks' professional staff and management on key strategic and competitive issues.

90.     Although no bank is permitted to serve as a member of the Board of Directors of both networks simultaneously, all but one of the Bank Defendants have had representatives on one of the associations' boards of directors as well as on the important committees that influence policy for each network. For example, in 1996, the year that MasterCard passed its exclusionary rule to complement Visa's, twelve of the twenty-one banks represented on Visa's Board of Directors were also represented on MasterCard's Business Committee. Seventeen of the twenty-seven banks on MasterCard's Business Committee had representatives on Visa's Marketing Advisors Committee. Seven of the twenty-two banks represented on MasterCard's Board of Directors also were represented on Visa's Marketing Advisors Committee. In total, approximately nineteen banks, including all but one of the Bank Defendants, have had a representative on the board of directors of one association and on at least one important committee of the other association.

91.     In addition to their participation through the Board of Directors and significant management committees, the Bank Defendants play central roles in decision-making on important matters. The networks' managements consult with the largest constituents in connection with key issues. Thus, decisions that significantly impact the Visa and MasterCard networks involve consideration of the views of the Bank Defendants, whether or not those members sit on the Board of that particular network.

92.     Because the Visa and MasterCard networks serve essentially the same owners and stakeholders, the networks frequently cooperate. The networks have cooperated, for example, on

23

such matters as competitive advertising, rules enforcement, fraud reduction, and interchange pricing. For many years, the networks have also jointly participated in biannual Rules Alignment Meetings.

93.     Furthermore, the significant overlap in ownership and governance facilitates the transfer of competitively sensitive information and decisions about the actions of one association to the other. In 1992, MasterCard International's Executive Vice President and General Counsel wrote in a letter to the Department of Justice that "when one board acts with respect to a matter, the results of those actions are disseminated to the members which are members in both organizations. As a result, each of the associations is a fishbowl and officers and board members are aware of what the other is doing, much more so than in the normal corporate environment."

## D.     Defendants' Concerted Anticompetitive Conduct

94.     Through their control over Visa and MasterCard, the Bank Defendants have adopted, maintained, adhered to, and enforced rules and policies that have unlawfully precluded American Express from competing for bank issuers of its cards. The Bank Defendants, with, by, and through Visa and MasterCard, conspired to enact these exclusionary rules in direct response to competitive pressures from card network competitors, principally American Express.

95.     For example, Defendants' exclusionary rules forbid any bank issuer of Visa or MasterCard to issue American Express cards. Under these rules, the penalty for any bank member that issues American Express cards is expulsion from the Visa and MasterCard networks, including termination of the bank member's right to issue Visa and MasterCard payment cards and denial of access to the networks' significant Cirrus and Plus automated teller-machine networks. The Visa and MasterCard exclusionary rules are specific in their discriminatory exclusion; each covers American Express but exempts each other.

### *Visa U.S.A. Enacts Its Exclusionary Rule*

96.     By the beginning of the 1990s, Visa and MasterCard grew increasingly concerned about competition from American Express as well as from Sears, which had entered the general purpose card network services market with its Discover card, operating on its Novus network. In response, on March 15, 1991, Visa U.S.A.'s Board of Directors unanimously agreed to adopt Visa U.S.A. by-law 2.10(e). By-law 2.10(e) states in pertinent part: "The membership of any member shall automatically terminate in the event it, or its parent, subsidiary or affiliate, issues, directly or indirectly, Discover Cards or American Express Cards, or any other card deemed competitive by the Board of Directors . . . ."

97.     Visa by-law 2.10(e) expressly singles out American Express and Discover, the two general purpose card networks in which the Visa and MasterCard member banks did not have any substantial economic interest. By contrast, Visa's Board has never applied the restrictions of by-law 2.10(e) to MasterCard – or Diners Club, which is owned by a bank that is a member of both Visa and Mastercard, or JCB, a smaller general purpose card network with an exclusive issuing arrangement with Household Bank – because Visa's large bank members hold a financial interest in those networks.

### *The Competitive Threat From American Express*

98.     By 1995, American Express was actively pursuing card-issuing relationships with financial institutions, both in the United States and abroad. Abroad, where no exclusionary rules impeded competition (Visa by-law 2.10(e) was limited by its terms to the United States), American Express was able to contract with banks to issue American Express cards. Although American Express' ability to compete abroad was itself constrained by Defendants' exclusionary

25

conduct in the United States, by late 1995, American Express had contracted with numerous international banks, which issued tens of thousands of American Express cards. As American Express signed international banks as card issuers, merchant acceptance of American Express cards increased not only because of the greater number of American Express cards in circulation, but also because, through its foreign bank relationships, American Express developed relationships with those banks' merchant customers.

99.     By 1996, in the United States, American Express had decided to invite Visa and MasterCard member banks to issue cards on the American Express network. In fact, because American Express had positioned itself as an attractive alternative for banks with MasterCard portfolios that wished to issue both MasterCard and American Express cards (at the expense of losing their Visa issuing rights), several banks were seriously considering entering into issuing agreements with American Express.

100.    In May 1996, the competitive threat to Visa and MasterCard heightened when American Express CEO Harvey Golub gave the keynote speech to the Credit Card Forum, the U.S. card industry's largest annual conference, in Atlanta, Georgia. During that speech, Golub openly invited U.S. banks to join American Express in issuing consumer cards on American Express' worldwide network. Golub specifically pointed out that foreign bank issuers had found issuing American Express cards to be a profitable and beneficial venture. Golub also noted that while Visa's by-law 2.10(e) precluded Visa member banks from taking advantage of his invitation, MasterCard's members (at that time) faced no such prohibition. Golub thus emphasized that banks could maintain card issuance through MasterCard while pursuing opportunities with American Express.

101. Golub's speech immediately sparked strong interest among U.S. banks, several of which entered into discussions with American Express about issuing its cards. These banks included, among others, Union Bank, First Consumers National, Key Corporation, First USA, MBNA, Dime Bank, Mellon Bank, Wachovia, Banco Popular North America, and Heartland Savings Bank.

102. The competitive threat posed by American Express to Visa and MasterCard banks caused Visa, MasterCard, the Bank Defendants, and other member banks great concern. Visa's senior management worried that American Express' partnerships with bank issuers would increase American Express' card issuance and merchant acceptance. A January 1996 Visa presentation entitled "Visa Competitive Framework and Competitive Responses," which was intended as an evaluation of the "immediate and future threats posed by global competitors . . . . affecting all Visa Regions," articulated Visa's concern that American Express' partnerships with Visa member banks "threaten to rapidly erode" Visa's cherished merchant acceptance advantage. An internal Visa International memorandum entitled "Amex Bank Partnerships" recognized that "AmEx's bank partnership program poses a threat by contributing significantly to their product, acceptance, and international growth initiatives," and noted that if American Express were no longer "precluded from partnering with U.S. banks," its arrangements with "bank partners could significantly increase [American Express'] acceptance and cards." And, an April 22, 1996 Visa "Global Competitive Assessment" projected a $770 million per year income loss to Visa's bank members if American Express achieved acceptance parity, while advance materials for Visa International's June 2, 1996 meeting reflect a discussion about the potential effects of American Express' partnerships "on Member Profit."

27

103.    By February 1996, MasterCard International President and CEO Eugene Lockhart had already seen a number of cases cross his desk in which MasterCard member banks in several regions sought to issue cards with American Express. He was quoted in a trade publication: "If anyone thinks this is a European-only issue, they're crazy. I probably have on my desk three cases from Latin America, one from Canada, several from the United States and more than 10 from Asia, where members of MasterCard seek to issue an American Express Card."

104.    By June 1996, Lockhart and Alan Heuer, the President of MasterCard's U.S. Region, knew that a number of MasterCard member banks were considering issuing American Express cards. Unless they were stopped, Lockhart expected that five to ten large MasterCard issuers around the world, including in the United States, would soon issue American Express cards.

### Defendants' Anticompetitive Response

105.    To combat the increasingly serious competitive threat from American Express, the Bank Defendants and other members of the dominant Visa and MasterCard networks decided to close ranks. For example, by using the association structure to reaffirm and extend the networks' exclusionary rules, the Bank Defendants and other member banks sought to eliminate competition among themselves for American Express card issuance and to shut the door on competition from American Express in the general purpose card network services market by precluding American Express from obtaining any bank issuers for its cards.

106.    Foreclosed in the United States by Visa by-law 2.10(e), American Express had entered into issuing arrangements with a number of international banks by the fall of 1995. Visa senior management became concerned that American Express' partnerships with Visa member banks would grow American Express' card issuance and merchant acceptance and erode Visa's

28

market share. In response, Visa International planned to enact and enforce a global exclusionary rule patterned on its U.S. exclusionary rule, Visa's by-law 2.10(e).

107.    This exclusionary plan would have been implemented as planned had it not been for the intervention of European competition authorities. In May 1996, shortly before Visa International's Board meeting, the European Commission Directorate for Competition publicly expressed doubts about the legality of such an exclusionary rule, warning that interference with European banks' freedom to choose which cards to issue would be "unacceptable."

108.    Although this legal pressure prevented Visa International from enacting its own exclusionary rule, at its June 5, 1996 meeting, Visa International's Board delegated authority to enact such restraints to Visa's various regional boards, and encouraged them to adopt an exclusionary rule.

109.    Visa International thus communicated to co-conspirators its support for the continuation and extension of rules to bar competition from American Express and, more specifically, its support for Visa U.S.A.'s continuation of by-law 2.10(e).

110.    Three weeks after Visa International encouraged adoption of supplemental exclusionary rules and less than two months after the speech in which American Express' CEO had encouraged U.S. banks to partner with American Express, MasterCard and its banks adopted a MasterCard exclusionary rule for the United States. This rule to bar competition from Amex was dubbed the "Competitive Programs Policy" (the "CPP"). MasterCard's U.S. Region Board adopted the CPP on June 28, 1996, subject to a delegation of authority from MasterCard International's Board, which was made the following day.

111.    MasterCard's CPP states: "With the exception of participation by members in Visa, which is essentially owned by the same member entities, and [Diners Club and JCB],

29

members of MasterCard may not participate either as issuers or acquirers in competitive general purpose card programs."

112.     MasterCard's exclusionary rule mirrors Visa by-law 2.10(e), precluding member banks, including the Bank Defendants, from issuing American Express cards, but permitting member banks to issue Visa (as well as Diners Club and JCB) cards. According to MasterCard's former CEO, Eugene Lockhart, applying MasterCard's CPP to Visa "wasn't practical" because the same members owned both networks.

113.     The CPP was enacted over the objection of six MasterCard board members, a number of whom argued that this exclusionary rule prevented the market from deciding whether banks entered into issuing agreements with American Express and whether banks should be able to offer their customers all available brands. However, after adoption of the rule, all six of these board members adhered to it pursuant to the agreement of all members "to abide by their association's by-laws and other regulations." 344 F.3d at 235.

114.     Consideration of MasterCard's exclusionary rule began in response to American Express' increased efforts to form card-issuing arrangements with Visa and MasterCard member banks, both in the United States and abroad. Lockhart and certain members of MasterCard's senior management recognized that without an exclusionary rule boycotting American Express, MasterCard could gain market share at Visa's expense through bank partnerships with American Express. Nevertheless, the approach that prevailed at MasterCard was the harder-line, anticompetitive position reflected in Visa's exclusionary rule. That approach was articulated by MasterCard's current CEO Robert Selander, who wanted to "make it as hard as possible to have Amex do anything anywhere in the world." Similarly, Defendant Chase's representative to the MasterCard Board, who voted for the exclusionary rule, was "absolutely adamant" that an

exclusionary rule was needed to protect both the Visa and the MasterCard associations, in which Chase had approximately equal shares. In the words of MasterCard's Lockhart, the Chase representative was "quite concerned, as to the strength [of the position] that MasterCard would take, felt it was important to send a signal to the American banking community. And he threatened that."

115. Thus, like the reaffirmation of Visa's exclusionary rule, the clear purpose of MasterCard's exclusionary rule was to prevent competition in the general purpose card network services market by preventing member banks from issuing American Express cards. Moreover, the necessary consequence of the rule was to protect and extend, for the benefit of the Bank Defendants and other member banks, Visa and MasterCard's joint stranglehold on the general purpose card network services market. As this Court has found, "the evidence shows that MasterCard adopted its CPP in response to American Express' overtures to U.S. banks to issue American Express cards," and that MasterCard's rule was motivated by a desire "to restrict competition at the network and issuer levels to enhance member bank profitability," "to make sure that if all the members couldn't have the advantage of issuing American Express cards, none would," and "to avoid loss of market share by the *two networks that the members own*." 163 F. Supp. 2d at 401 (emphasis added). This Court further explained that "[t]o prevent competition on those terms in the United States, the member banks agreed that any bank that obtained such an advantage would be penalized by being excluded from participation in both dominant general purpose card systems." Id. at 400. The United States Court of Appeals for the Second Circuit also held that by agreeing to abide by the exclusionary rules of their associations, the member banks (including the Bank Defendants) imposed a horizontal restraint "on themselves" and

31

thereby "agreed not to compete with [each other] in a manner which the consortium considers harmful to its combined interests." 344 F.3d at 242.

### E.    Anticompetitive Effects of Defendants' Unlawful Conduct

116.    As Defendants and their co-conspirators intended, their illegal agreements have substantially harmed competition in the U.S. general purpose card network services market by making it impossible for American Express to compete for bank issuers of its cards.

117.    Defendants' exclusionary rules exploit Visa and MasterCard's dominance in the network services market. Because Defendants' rules penalize any Visa or MasterCard bank member that issues an American Express card by mandating forfeiture of that member's right to issue Visa or MasterCard cards (or any cards with access to those networks' Cirrus and Plus automatic teller machine systems), the costs to U.S. banks of issuing American Express cards are prohibitive.

118.    As a result, despite American Express' vigorous efforts during the past decade to reach issuing arrangements with Visa and MasterCard member banks – including by offering substantial incentive packages to the first bank that would break rank – by the end of 2003, "[n]o United States bank ha[d] been willing to give up its membership in the Visa U.S.A. and MasterCard networks in order to issue Amex or Discover cards." 344 F.3d at 237. "In addition, Amex, despite repeated recent attempts, ha[d] been unable to persuade any issuing banks in the continental United States to utilize its network services because the exclusivity rule would require such issuing banks to give up membership in the Visa and MasterCard consortiums, and banks are unwilling to do so." Id. at 240.

119.    Even the banks that had expressed their own financial interest in issuing American Express cards – and objected to MasterCard's exclusionary rule – had refused to issue American Express cards.

120.    "The result [of the member banks' agreement to penalize any bank that attempted to reach agreement with American Express or Discover], as intended, ha[d] been that *no bank has broken rank*; rather than lose access to the Visa and MasterCard networks (as well as their ATM networks, Cirrus and Plus), no bank in the continental United States ha[d] agreed to issue American Express cards." 163 F. Supp. 2d at 400 (emphasis added).

121.    Defendants' exclusionary rules have thus barred American Express from a substantial part of the network services market. "In the market for *network services,* where the four networks are sellers and issuing banks and merchants are buyers, the exclusionary rules enforced by Visa U.S.A. and MasterCard have *absolutely prevented* Amex and Discover from selling their products at all." 344 F.3d at 243 (second emphasis added). Moreover, "Since the bank members of Visa and MasterCard issue over 85% of general purpose cards comprising some 75% of the transaction volume," the exclusionary rules have "preserved for Visa and MasterCard" a "huge portion of the market for network services." 163 F. Supp. 2d at 382.

122.    By precluding American Express and others from competing to provide general purpose credit and charge card network services to member bank issuers, the Visa and MasterCard exclusionary rules have harmed competition and consumers without any valid, countervailing procompetitive justification. As this Court has recognized, these "clear anticompetitive effects" arising from Defendants' exclusionary rules, id. at 408, include: (a) in the general purpose card market, reduced "overall card output," "available card features," and "consumer choice," id. at 379; and (b) in the general purpose card network services market,

33

decreased network services output, stunted price competition, and restrained competition in the

provision of network services to bank issuers through the exclusion of American Express and

Discover. Id. As the Second Circuit found, "The most persuasive evidence of harm to

competition is the total exclusion of American Express and Discover from a segment of the

market for network services." 344 F.3d at 240.

123.    Moreover, the harm to competition caused by Defendants' exclusionary rules

also has had numerous intended and harmful effects on American Express. As this Court has

recognized, those harmful effects on American Express include:

a.    limiting American Express' card output and issuance volume, 163 F.
Supp. 2d at 329, 379, 387;

b.    precluding American Express from a "huge portion" of the general
purpose card network services market, id. at 382, which also

(1)    prevents American Express from accessing "issuing competencies
and segmented marketing expertise" of Visa and MasterCard
member banks, id. at 379;

(2)    deprives American Express of the opportunity to access member
banks' "more profitable relationship customers with checking
accounts," id.; and

(3)    prevents American Express from offering customers "unique
benefits" that would be created through combination of American
Express brand features with member banks' products, id. at 396;

c.    "stunting [American Express'] competitive vitality," id. at 379;

d.    decreasing American Express' transaction volume, id.;

34

e.  constraining American Express' market share, id. at 382;

f.  restraining American Express' merchant acceptance levels, id. at 329;

g.  decreasing American Express' scale and relevance, id. at 382, 389, 408;

h.  preventing American Express from profitably competing to buy portfolios from other cards issuers, such as banks, id. at 394;

i.  restraining American Express' ability to develop and distribute new features such as smart cards, id. at 329;

j.  foreclosing American Express from competing in the provision of offline debit services, id.; and

k.  foreclosing American Express from providing "relationship" and other cards with bank-provided offline debit capability. Id. at 408.

## F.  Injury to American Express

124.  Defendants' anticompetitive conduct has directly and proximately caused American Express to suffer injury to its business and property. American Express' injuries are of the type the antitrust laws were designed to prevent, and those injuries flow directly from the aspects of Defendants' conduct that make it unlawful.

125.  More specifically, as a result of Defendants' anticompetitive conduct, American Express has lost significant sources of profit in the United States, including:

a.  Lost profits from lost merchant discount revenues on bank-issued general purpose cards;

b.  Lost profits from lost merchant discount revenues on existing American Express cards as a result of decreased merchant acceptance;

35

c.      Lost profits from decreased American Express card issuance as a result of decreased merchant acceptance;

d.      Lost other merchant revenues and fees from decreased merchant acceptance;

e.      Lost network profits and debit card transactions;

f.      Lost profits from portfolio acquisitions;

g.      Lost profits from lost fees and ancillary revenues from issuing banks; and

h.      Lost economies of scale.

126.    The anticompetitive conduct of Defendants is a substantial contributing cause of American Express' injuries in this case. The Visa and MasterCard exclusionary rules that Defendants and their co-conspirators enacted, maintained, enforced, and promoted have caused each of the types of harm to American Express that are set forth above in paragraphs 116-125.

## CLAIMS FOR RELIEF

### COUNT I.
### Sherman Act § 1: Intra-Association Conspiracies To Restrain Trade
### (Visa and MasterCard)

127.    Plaintiff realleges and incorporates by reference paragraphs 1-126 as set forth above.

128.    Visa and MasterCard have engaged in continuing intra-Association combinations and conspiracies to unreasonably restrain competition in the Relevant Markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. These combinations and conspiracies have also constituted group boycotts in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

129.    In furtherance of these continuing intra-Association combinations and conspiracies, Visa and its member banks, and MasterCard and its member banks, have adopted,

36

agreed to abide by, and abided by rules and policies that disadvantage or exclude rival general purpose card networks, such as American Express, including rules or policies that prohibit Visa and MasterCard member banks from issuing cards on the American Express network.

130.    Through the exclusion of competing network service providers, such as American Express, Visa and MasterCard have preserved a "huge portion of the market for network services" for themselves.  163 F. Supp. 2d at 382.

131.    Each of these combinations and conspiracies has caused significant harm to competition in the Relevant Markets, including, without limitation, the effects described above in paragraphs 116-23.

132.    As a result of the combined effect of these combinations and conspiracies, and their harm to competition, American Express has suffered substantial and continuing injuries.

### COUNT II.
### Sherman Act § 1: Intra-Association Conspiracies To Restrain Trade
### (Bank Defendants)

133.    Plaintiff realleges and incorporates by reference paragraphs 1-132 as set forth above.

134.    The Bank Defendants have engaged in continuing intra-Association combinations and conspiracies to unreasonably restrain competition in the Relevant Markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  These combinations and conspiracies have also constituted group boycotts in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

135.    Each Bank Defendant has agreed to abide by and has abided by Visa by-law 2.10(e) and MasterCard's CPP.

37

136. Each of these combinations and conspiracies has caused significant harm to competition in the Relevant Markets, including, without limitation, the effects described above in paragraphs 116-23.

137. As a result of the combined effect of these combinations and conspiracies, and their harm to competition, American Express has suffered substantial and continuing injuries.

## COUNT III.
### Sherman Act § 1: Single Inter-Association Conspiracy Among Visa, MasterCard, Bank Defendants And Other Member Banks To Restrain Trade (All Defendants)

138. Plaintiff realleges and incorporates by reference paragraphs 1-126 as set forth above.

139. The Bank Defendants, together with and through Defendants Visa and MasterCard and other member banks, have engaged in a single continuing combination and conspiracy to unreasonably restrain competition in the Relevant Markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This single and continuing combination and conspiracy also has constituted a group boycott in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

140. In furtherance of this continuing combination and conspiracy, the Bank Defendants, in collaboration with and through Defendants Visa and MasterCard and other member banks, "have agreed to abide by a restrictive exclusivity provision to the effect that in order to share the benefits of their association by having the right to issue Visa or MasterCard cards, they must agree not to compete by issuing cards of Amex or Discover. The restrictive provision is a horizontal restraint adopted by 20,000 competitors." 344 F.3d at 242. Through adoption and adherence to these rules and policies, the Bank Defendants along with Visa, MasterCard, and other bank members have disadvantaged and excluded rival general purpose card networks, such as American Express.

38

141.    This combination and conspiracy has caused significant harm to competition in the Relevant Markets, including, without limitation, the effects described above in paragraphs 116-123.

142.    As a result of this combination and conspiracy, and its harm to competition, American Express has suffered substantial and continuing injuries.

### COUNT IV.
### Sherman Act § 2: Single Conspiracy To Monopolize Among Visa, MasterCard, Bank Defendants And Other Member Banks – General Purpose Card Network Services Market (All Defendants)

143.    Plaintiff realleges and incorporates by reference paragraphs 1-126 as set forth above.

144.    The Bank Defendants, in collaboration with and through Visa and MasterCard and other member banks, have engaged in a continuing combination and conspiracy to monopolize the general purpose card network services market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

145.    In entering into this combination and conspiracy, Visa and MasterCard have exercised market power in the general purpose card network services market with the specific intent to monopolize that market.

146.    In furtherance of this continuing combination and conspiracy, the Bank Defendants, in collaboration with and through Visa and MasterCard and other member banks, have adopted and adhered to rules and policies that disadvantage or exclude rival general purpose card networks, such as American Express, by prohibiting Visa and MasterCard member banks from issuing cards on the American Express network.

39

147. This combination and conspiracy has had anticompetitive effects in the Relevant Markets, including, without limitation, the effects described above in paragraphs 116-123.

148. As a result of this combination and conspiracy, and its harm to competition, American Express has suffered substantial and continuing injuries.

## COUNT V.

### Sherman Act § 1: Conspiracies To Unreasonably Restrain Trade In The Relevant Markets, In The Debit Card Network Services Market, And By Other Means And Methods (All Defendants)

149. Plaintiff realleges and incorporates by reference paragraphs 1-126 as set forth above.

150. The Bank Defendants, in collaboration with and through both Visa and MasterCard and other member banks, and each of them, have entered into a conspiracy or conspiracies to unreasonably restrain trade in the general purpose card network services market, the general purpose card issuing market, and the debit card network services market by engaging, and agreeing to engage, in a course of conduct that includes, among other things, all of the conduct alleged in paragraphs 1-126 above, together with the following:

*Exclusion Of American Express From The Debit Card Network Services Market*

151. The "debit card network services market" in the United States constitutes a separate and distinct "Relevant Market." The debit card network services market is the market in which authorization, clearance, and settlement services are performed for debit card transactions.

152. Unlike credit and charge cards, debit cards promptly access money directly from a cardholder's checking or deposit account, thereby strongly differentiating debit cards from general purpose credit and charge cards. Consumers do not consider debit cards to be reasonably interchangeable with general purpose credit and charge cards.

153.     Visa and MasterCard, jointly and separately, have and exercise market power in the debit card network services market.

154.     Visa and MasterCard dominate the debit card network services market. Visa and MasterCard together control approximately 65 percent of the dollar value of all debit card transactions in the United States.

155.     Visa and MasterCard, the Bank Defendants, and other member banks have adopted and adhered to rules and policies that disadvantage or exclude rival general purpose card networks, such as American Express, by prohibiting Visa and MasterCard member banks from issuing cards on the American Express network. By denying American Express the opportunity to obtain significant bank issuance of its general purpose credit and charge cards, and by denying American Express the opportunity to provide debit card network services to bank-issued debit cards, Visa and MasterCard's exclusionary rules have foreclosed American Express and all other potential competitors from providing debit card network services.

156.     Visa and MasterCard's exclusionary rules have caused significant harm to competition in the debit card network services market, including, without limitation, reducing overall product output and consumer choice.

157.     Defendants' exclusionary rules have also prevented competitive entry, including entry by American Express, into the debit card network services market. Entry into that market is possible only through access to bank issuers, and the exclusionary rules prevent all bank issuers from issuing debit cards on the American Express network.

158.     American Express has, and has had since no later than 1997, the intent, preparedness, and capability to provide debit card network services and, thus, to enter the debit card network services market.

159.  As a result of these combinations and conspiracies, and their harm to competition, American Express has suffered substantial and continuing injuries.

**Exclusive Dealing Arrangements**

160.  Visa and MasterCard, in collaboration with the Bank Defendants and other Visa and MasterCard member banks, have entered into combinations and conspiracies to extend and perpetuate the effect of their exclusionary rules, found unlawful by this Court, by agreeing to adopt and implement exclusive dealing arrangements with certain member banks (hereinafter, "dedication agreements" or "exclusive agreements"). These exclusive agreements are multi-year contracts, extending up to ten years in duration, which obligate member banks to dedicate themselves to issuing all new cards exclusively from the association with which they have contracted, and requiring among other things that within a short period of time, such banks issue 80% to 90% of their general purpose cards as the contracting association's card. These exclusive agreements, as well as the financial payments made by the contracting association to the banks which are parties to the exclusive agreements, are supported by all member banks, including those that do not have such exclusive agreements. The member banks agree to provide such support because they receive the benefit of continuing the elimination of competition among each other based upon the actual or potential issuance of American Express general purpose cards by competing banks.

161.  The purpose and effect of these exclusive agreements is to continue the boycott of American Express by, among other things, hindering member banks from issuing American Express general purpose cards. The exclusive agreements represent a horizontal conspiracy among Visa and MasterCard member banks, including the Bank Defendants, as well as agreements between Visa and its member banks and between MasterCard and its member banks.

42

162. To the extent that there are benefits arising from competition between Visa and MasterCard to sign member banks to exclusive agreements ("Inter-Association Competition"), those benefits are outweighed by the harm to competition caused by the continuing boycott of American Express. Even if the harm to competition arising from the boycott of American Express were outweighed by the benefits to competition from the Inter-Association Competition, requiring that the exclusive agreements also apply to American Express is not reasonably necessary to accomplish the benefits of the Inter-Association Competition from such agreements. The fact that Visa, MasterCard, the Bank Defendants and other member banks have agreed to adopt and implement exclusive agreements that preclude member banks from issuing American Express cards, and are not limited to precluding member banks from issuing cards on the other association, shows that the purpose of such agreements is to injure American Express and competition.

163. The effect of these exclusive agreements is to foreclose a substantial volume of commerce from free and open competition by, among other thing, creating a continuing boycott of American Express.

***Anticompetitive Effects Of Violations***

164. Each of the above-described agreements, rules, and prohibitions, separately and together with Defendants' other conduct in furtherance of their conspiracies and combinations in restraint of trade, has caused significant harm to competition in the general purpose card network services, the general purpose card, and the debit card markets, including, without limitation, the effects described above in paragraphs 116-23.

165. As a result of these acts, and their harm to competition, American Express has suffered substantial and continuing injuries, including, among other things, the following:

43

- All of the injuries identified in paragraphs 124-26 above;

- Injuries attributable to Defendants' total exclusion of American Express from the ability to offer debit card network services;

- Injuries attributable to diminished profits and network growth from the inability of the American Express network to offer bank-issued, demand-deposit-account-based smart cards and/or relationship cards;

- Injuries attributable to the perpetuation of the effects of the exclusionary rules through Defendants' exclusive dealing arrangements;

- Injuries attributable to diminished card-issuing transaction volume and decreased merchant acceptance caused by the inability of American Express to acquire banks' card portfolios; and

- Injuries attributable to lost profits, merchant discount revenues, fees, and ancillary revenues; diminished network growth and card-issuing transaction volume; decreased merchant acceptance; and lost economies of scale resulting from the combined effects of Defendants' unlawful actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

a) The Court declare, adjudge, and decree that Defendants have committed the violations of federal law alleged herein;

b) All Defendants, their directors, officers, employees, agents, successors, owners, members be enjoined and restrained from continuing or maintaining in any manner, directly or indirectly, the rules, policies, and agreements at issue in this Complaint; and

c) The Court award Plaintiff full compensation for the damages it has sustained, from each Defendant, jointly and severally, on each of Plaintiff's Claims for Relief, in an amount to be proved at trial, and to be trebled according to law, plus interest, attorneys' fees and costs of suit, and such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 15, 2004

Respectfully Submitted,

David Boies (DB-4399)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
(914) 749-8200

Donald L. Flexner (DF-4812)
Stephen R. Neuwirth (SN-5367)
BOIES, SCHILLER & FLEXNER LLP
570 Lexington Avenue
New York, New York 10022
(212) 446-2300

*Counsel for Plaintiff*

OF COUNSEL:
Louise M. Parent, General Counsel
Stuart A. Alderoty, Chief Litigation Counsel
American Express Company
Three World Financial Center
New York, NY 10285