**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x
                                                                :
**AMERICAN EXPRESS TRAVEL**                                     :
**RELATED SERVICES COMPANY, INC.**                              :
                                        **Plaintiff,**          :        **Case No. 04-CV-08967 (BSJ)**
                                                                :
                              – *against* –                     :        **ECF CASE**
                                                                :
**VISA U.S.A. INC.,** *et al.*                                  :
                                                                :
                                   **Defendants**               :
-------------------------------------------------------------- x


**PLAINTIFF AMERICAN EXPRESS' CONSOLIDATED OPPOSITION TO MOTIONS**
**TO DISMISS OF VISA USA, VISA INTERNATIONAL, AND MASTERCARD**

                                        David Boies (DB-4399)
                                        BOIES, SCHILLER & FLEXNER LLP
                                        333 Main Street
                                        Armonk, New York  10504
                                        (914) 749-8200

OF COUNSEL:                             Donald L. Flexner (DF-4812)
Louise M. Parent, General Counsel       Stephen R. Neuwirth (SN-5367)
Stuart Alderoty, Chief Litigation Counsel   BOIES SCHILLER & FLEXNER LLP
American Express Company                570 Lexington Avenue, 16th Floor
Three World Financial Center            New York, New York  10022
New York, New York  10285               (212) 446-2300

                                        *Counsel for Plaintiff*

February 21, 2005

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 7

I.    AMERICAN EXPRESS' CLAIMS ARE NOT TIME-BARRED. .................................. 8

    A.    American Express' Claims Are Timely Because It Did Not Suffer
       Injury To Its Business Until 1996, Well Within The Limitations Period .............. 8

        1.    An antitrust plaintiff's cause of action does not accrue – and the statute
           of limitations does not run – until plaintiff incurs actual injury-in-fact. .... 9

        2.    American Express does not allege – and did not suffer – injury
           from the Exclusionary Rules outside the limitations period. .................. 12

           a.    American Express alleges antitrust injury that occurred
               beginning in 1996, within the limitations period. ....................... 12

           b.    The Court's Findings confirm that American Express
               was injured in 1996, within the limitations period ..................... 13

           c.    Defendants have admitted that American Express
               was not injured until 1996. ......................................... 13

        3.    Defendants' reliance on documents created within the
           limitations period only highlights the lack of injury to
           American Express prior to the limitations period .................................. 14

    B.    Even If A Cause Of Action Had Accrued Before The Limitations
       Period, Overt Acts In Furtherance Of Defendants' Continuing
       Unlawful Conduct Injured American Express Beginning in 1996,
       Within The Limitations Period. ....................................................... 15

        1.    Defendants' efforts to portray their 1996 conduct as nothing
           more than an inertial reaffirmation of By-law 2.10(e) distorts
           beyond recognition the Complaint and the Court's Findings. ................ 19

        2.    The cases relied on by Defendants in no way alter the
           conclusion that American Express' claims are timely. ........................... 21

i

II.   THIS COURT'S FINDINGS, AFFIRMED ON APPEAL AND
      ADOPTED IN THE COMPLAINT, NOT ONLY SUPPORT BUT
      COMPEL THE CONCLUSION THAT A SINGLE CONSPIRACY
      EXISTED AMONG ALL DEFENDANTS TO EXCLUDE
      AMERICAN EXPRESS FROM THE NETWORK SERVICES MARKET .................. 23

      A.    The Complaint Describes An Overarching Conspiracy,
            Orchestrated By The Defendants And Their Co-Conspirators,
            To Protect The Share Of The Two Associations And The
            Profits Of Member Banks By Boycotting American Express. ........................... 23

      B.    This Court And The Court Of Appeals Made Express Findings
            That Support, If Not Compel, A Single Conspiracy Claim In This Case............. 29

      C.    There Is No Basis For The Suggestion That Common
            Ownership "Tends" To Preclude Conspiracy Claims. ........................................ 30

      D.    The Court's Dual Governance Rulings Have No Bearing On
            The Allegations Of A Single Conspiracy To Boycott American Express. .......... 31

III.  EVEN ABSENT A SINGLE CONSPIRACY, MASTERCARD'S
      CPP HARMED AMERICAN EXPRESS BY PREVENTING MASTERCARD
      BANKS FROM DOING BUSINESS WITH AMERICAN EXPRESS
      AND BY REINFORCING THE EFFECTIVENESS OF BY-LAW 2.10(E). ................. 33

      A.    The Complaint Alleges, And The Findings Establish,
            That The CPP Injured American Express By Preventing
            American Express From Doing Business With *MasterCard Banks*. ................... 34

      B.    The Complaint Alleges That The CPP Prevented The Circumvention
            Of By-law 2.10(e) By Visa Banks, And Thus Harmed American Express
            By Preventing It From Doing Business With *Visa Banks*. ................................. 36

      C.    Visa And MasterCard Are Jointly And Severally Liable For
            The Indivisible Injury Caused By The Exclusionary Rules. ............................... 37

IV.   VISA INTERNATIONAL WAS INSTRUMENTAL IN THE
      CONTINUATION OF BY-LAW 2.10(E), THE ADOPTION
      OF THE CPP AND THE IMPLEMENTATION OF THE SINGLE
      CONSPIRACY TO BOYCOTT AMERICAN EXPRESS. ........................................... 39

      A.    The Complaint Specifically Alleges The Means By Which
            Visa International Participated In The Conspiracy To Maintain
            By-law 2.10(e), To Adopt The CPP And To Create A Single Conspiracy. ......... 39

      B.    As A Full Member Of The Conspiracy, Visa International Is Bound By
            The Actions Of Its Co-Conspirators So Long As It Remains A Member............. 40

C.    Visa International Never Withdrew From The Conspiracies
And Is Thus Liable For The Acts Of Its Co-Conspirators................................... 41

V.    A CONSPIRACY TO MONOPOLIZE
AMONG COMPETITORS IS ACTIONABLE. ............................................................ 42

A.    American Express Does Not Have To Allege That Defendants
Intended To Create A Monopoly In A Single Firm. ............................................ 42

B.    A Section 2 Conspiracy Claim Is Not Duplicative Of A Section 1 Claim. .......... 46

VI.    THE COMPLAINT PROPERLY PLEADS AN ANTITRUST
VIOLATION IN THE DEBIT CARD NETWORK SERVICES MARKET. ................. 47

A.    Count V Of The Complaint Properly Alleges The Debit Card
Network Services Market Previously Found By This Court
And In *In Re Visa Check/MasterMoney Antitrust Litigation.* ............................. 47

B.    The Complaint Alleges That The Exclusionary Rules
Caused Precisely The Same Harms In The Debit Card
Network Services Market As Already Identified By This Court......................... 49

VII.    THE COMPLAINT PROPERLY PLEADS THAT THE
ASSOCIATION DEFENDANTS HAVE VIOLATED SECTION 1
OF THE SHERMAN ACT BY EXTENDING THEIR BOYCOTT
OF AMERICAN EXPRESS THROUGH DEDICATION AGREEMENTS. ................. 50

CONCLUSION ................................................................................................................ 54

## TABLE OF AUTHORITIES

## CASES

2361 State Corp. v. Sealy, Inc., 263 F. Supp. 845 (N.D. Ill. 1967) ............................................. 10

American Tobacco Co. v. United States, 328 U.S. 781 (1946) ...................................... 42, 43, 46

American Vision Centers, Inc. v. Cohen, 711 F. Supp. 721 (E.D.N.Y. 1989) ........................... 31

Ansul Co. v. Uniroyal, Inc., 448 F.2d 872 (2d Cir. 1971) ........................................................ 12

Apex Oil Co. v. DiMauro, 822 F.2d 246 (2d Cir. 1987) ...................................................... 8, 26

Associated Press v. United States, 326 U.S. 1 (1945) ............................................................... 30

Bankers Trust Co. v. Feldesman, 676 F. Supp. 496 (S.D.N.Y. 1987) ....................................... 18

Bankers Trust Co. v. Rhoades, 859 F.2d 1096 (2d Cir. 1988) ................................................... 2

Battle v. Liberty Nat. Life Ins. Co., 493 F.2d 39 (5th Cir. 1974) ............................................. 52

Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263 (2d Cir. 1979) ............................ 11, 12

Blesedell v. Mobil Oil Co., 708 F. Supp. 1408 (S.D.N.Y. 1989) .............................................. 22

Camotex, S.R.L. v. Hunt, 741 F. Supp. 1086 (S.D.N.Y. 1990) .................................................. 9

Consolidated Terminal Sys., Inc. v. ITT World Communic.,
    535 F. Supp. 225 (S.D.N.Y. 1982) ................................................................................ 45, 46

Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962) ......................... 43

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984) ..................................... 31

Daggett v. Keshner, 14 Misc.2d 154, 149 N.Y.S.2d 422 (Sup. Ct. N.Y. County 1956) ............. 37

Daniel v. American Board of Emergency Medicine, 988 F. Supp. 112 (W.D.N.Y. 1997) ......... 18

Donahue v. Pendleton Woolen Mills, Inc., 633 F. Supp. 1423 (S.D.N.Y. 1986) ....................... 9

Driscoll v. City of New York, 650 F. Supp. 1522 (S.D.N.Y. 1987) .......................................... 22

Electronics Communic. Corp. v. Toshiba Amer. Consumer Prods., Inc.,
    No. 96 Civ. 1565 (RPP), 1996 WL 455011 (S.D.N.Y. Aug. 13, 1996) .............................. 45

Federal Trade Comm'n v. Indiana Federation of Dentists, 476 U.S. 447 (1986) ...................... 30

Geneva Pharmaceuticals Tech. Corp. v. Barr Laboratories, Inc., 201 F. Supp. 2d 236
(S.D.N.Y. 2002).................................................................................................. 31

George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,
554 F.2d 551 (2d Cir. 1977)............................................................................ 7

H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.,
879 F.2d 1005 (2d Cir. 1989).......................................................................... 45

Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,
128 F.3d 59 (2d Cir. 1997)............................................................................... 7

Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968)............................. 15

Harkins Amusement Enters., Inc. v. General Cinema Corp.,
850 F.2d 477 (9th Cir. 1988)..................................................................... 45, 46

Hecht v. Pro-Football Inc., 570 F.2d 982 (D.C. Cir. 1977)....................................... 9

Higgins v. NYSE, Inc., 942 F.2d 829 (2d Cir. 1991)............................................. 11

Hospital Building Co. v. Trustees of Rex Hosp., 425 U.S. 738 (1976) .................................. 7, 8

Hyde v. United States, 225 U.S. 347 (1912)...................................................... 41

Hydrolevel Corp. v. American Soc. Of Mech. Eng'rs, Inc.,
635 F.2d 118 (2d Cir. 1980)........................................................................ 37, 38

In re Ciprofloxacin Hydrochloride Antitrust Litig.,
261 F. Supp. 2d 188 (E.D.N.Y. 2003) ......................................................... 21, 22

In re Currency Conversion Fee Antitrust Litig.,
265 F. Supp. 2d 385 (S.D.N.Y. 2003) ............................................... 6, 27, 29, 31

In re Mercedes-Benz Antitrust Litig., 157 F. Supp. 2d 355 (D.N.J. 2001) ................................ 40

In re Nasdaq Market-Makers Antitrust Litig., 894 F. Supp. 703 (S.D.N.Y. 1995) .................... 26

In re Nine West Shoes Antitrust Litig., 80 F. Supp. 2d 181 (S.D.N.Y. 2000).......................... 11

In re Visa Check/MasterMoney Antitrust Litig.,
No. 96-CV-5238 (JG), 2003 WL 1712568 (E.D.N.Y Apr. 1, 2003)............. 28, 29, 44, 48, 49

International Distrib. Ctrs., Inc. v. Walsh Trucking Co., 812 F.2d 786 (2d Cir. 1987) ......... 44, 46

Johnson v. Nyack Hosp., 86 F.3d 8 (2d Cir. 1996)................................................. 11

Johnson v. Nyack Hosp., 954 F. Supp. 717 (S.D.N.Y. 1997)...................................... 11

Karlinsky v. New York Racing Assoc., 52 F.R.D. 40 (S.D.N.Y. 1971) ..................................... 48

Kasada, Inc. v. Access Capital, Inc.,
    No. 01 Civ. 8893 (GBD), 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ...................... 44, 46

Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997)............................................................... 1, 10

Kramer v. Pollock-Krasner Found., 890 F. Supp. 250 (S.D.N.Y. 1995)............................. 44, 45

LaBeach v. Nestle Co., 658 F. Supp. 676 (S.D.N.Y. 1987) ..................................................... 22

Minnesota Mining & Mfg. Co. v. Appleton Papers Inc.,
    35 F. Supp. 2d 1138 (D. Minn. 1999).............................................................................. 52

National Soc. of Prof'l Eng'rs. v. United States, 435 U.S. 679 (1978)................................... 30

NCAA v. Board of Regents, 468 U.S. 85 (1984)....................................................................... 30

Phoenix Elec. Co. v. Nat'l Elec. Contr. Assoc., Inc., 867 F. Supp. 925 (D. Or. 1994).............. 45

Pinkerton v. United States, 328 U.S. 640 (1946) ...................................................................... 40

Pinney Dock & Transport Co. v. Penn Central Corp.,
    991 F. Supp. 908 (N.D. Ohio 1998) ........................................................................... 40, 41

Pioneer Co. v. Talon, Inc., 462 F.2d 1106 (8th Cir. 1972)........................................................ 20

Radovich v. National Football League, 352 U.S. 445 (1957).................................................... 43

Ravo v. Rogatnick, 70 N.Y.2d 305 (1987) ............................................................................... 37

Red Lion Medical Safety, Inc. v. Ohmeda, Inc.,
    63 F. Supp. 2d 1218 (E.D. Cal. 1999) ......................................................................... 18, 20

Slotkin v. Citizens Co., 447 F. Supp. 253 (S.D.N.Y. 1978)....................................................... 37

Sun Dun, Inc. v. Coca-Cola Co., 740 F. Supp. 381 (D. Md. 1990) ........................................... 46

Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320 (1961) ................................................... 53

Telectronics Proprietary, Ltd. v. Medtronic, Inc., 687 F. Supp. 832 (S.D.N.Y. 1988)................ 9

Todd v. Exxon Corp., 275 F.3d 191 (2d Cir. 2001) ............................................................. 47, 49

United States v. Aluminum Co. of Am., 377 U.S. 271 (1964).................................................... 49

United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181 (2d Cir. 1989)......................... 25, 26

United States v. Berger, 224 F.3d 107 (2d Cir. 2000)................................................... 25, 28, 30

United States v. Consolidated Laundries Corp., 291 F.2d 563 (2d Cir. 1961) ............... 43, 44, 46

United States v. Eisen, 974 F.2d 246 (2d Cir. 1992) ................................................. 41

United States v. Flaharty, 295 F.3d 182 (2d Cir. 2002) ............................................ 41

United States v. Maldonado-Rivera, 922 F.2d 934 (2d Cir. 1990) ............................ 25

United States v. Martino, 664 F.2d 860 (2d Cir. 1981) ............................................. 25

United States v. Phelps Dodge Indust., Inc., 589 F. Supp. 1340 (S.D.N.Y. 1984) ...................... 26

United States v. Rea, 958 F.2d 1206 (2d Cir. 1992) ................................................. 42

United States v. United States Gypsum Co., 438 U.S. 422 (1978) ............................. 41

United States v. Vanwort, 887 F.2d 375 (2d Cir. 1989) ............................................ 25

United States v. Visa U.S.A. Inc., 163 F. Supp. 2d 322 and
    183 F. Supp. 2d 613 (S.D.N.Y. 2001), aff'd 344 F.3d 229 (2d Cir. 2003),
    cert denied, 125 S.Ct. 45 (2004) ................................................................. passim

Vitale v. Marlborough Gallery,
    No. 93 Civ. (PKL) 6276, 1994 WL 654494 (S.D.N.Y. July 5, 1994) ............................ 19, 21

Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council, 857 F.2d 55 (2d Cir. 1988).............. 45

Western Shoe Gallery, Inc. v. Duty Free Shoppers, Ltd.,
    593 F. Supp. 348 (N.D. Cal. 1984) ................................................................. 18

Zenith Radio Corp. v. Hazeltine Research Inc., 401 U.S. 321 (1971) ................................ passim

## STATUTES

15 U.S.C. § 15a .......................................................................................... 9

15 U.S.C. § 15b .......................................................................................... 3

15 U.S.C. § 16(i) ....................................................................................... 3, 8

15 U.S.C. § 2 ............................................................................................. 44

Fed. R. Civ. P. 8 ........................................................................................ 48

## OTHER AUTHORITIES

Restatement (Third) of Torts: Apportionment of Liability (2000) ............................................ 37

## INTRODUCTION

The Association Defendants' principal contention is that American Express' claims are time-barred. They offer two arguments.[1]

First, Visa USA argues that the four-year statute of limitations expired on March 15, 1995, on the theory that American Express' damages claim accrued four years earlier when Visa USA enacted By-law 2.10(e) and the conspiracy began. Visa USA at 7-9.[2] Second, while the Association Defendants recognize the well-established rule that overt acts taken in furtherance of a continuing conspiracy restart the limitations period, they argue that no such actions are alleged.

Neither argument is consistent with the Complaint, or with this Court's Findings as affirmed by the Court of Appeals.

*First*, a competitor's claim for antitrust damages accrues not when a conspiracy (or other antitrust violation) begins, but when the competitor is first injured by the violation and damages become ascertainable. This has been clear since <u>Zenith Radio Corp. v. Hazeltine Research Inc.</u>, 401 U.S. 321, 339 (1971), where the Supreme Court held that an antitrust cause of action accrues and the statute of limitations begins to run only when "a plaintiff feels the adverse impact of an antitrust conspiracy." The law has not changed. <u>See, e.g.</u>, <u>Klehr v. A.O. Smith Corp.</u>, 521 U.S. 179, 189-90 (1997) (recognizing <u>Zenith</u>'s rule in antitrust cases that a cause of action accrues and

---

[1] Defendants Visa U.S.A., Inc. ("Visa USA"), Visa International Service Association ("Visa Int'l"), MasterCard Incorporated and MasterCard International (together, "MasterCard" or "MC") are referred to collectively herein as the "Association Defendants," and citations to their briefs in support of their motions to dismiss follow the form "Visa USA at __," "Visa Int'l at __," and "MC at __." In addition, <u>United States v. Visa USA, Inc., et al.</u>, No. 98 CIV 7076 (BSJ), is referred to herein as the "<u>DOJ Case</u>," and the findings of fact and conclusions of law reported at 163 F. Supp. 2d 322 and 183 F. Supp. 2d 613 (S.D.N.Y. 2001), <u>aff'd</u>, 344 F.3d 229 (2d Cir. 2003), <u>cert. denied</u>, 125 S.Ct. 45 (2004), are cited with the short form "163 F. Supp. 2d at __," and "183 F. Supp. 2d at __," and are sometimes referred to as the "Findings."

[2] Visa USA's statute of limitations argument is joined expressly by Visa Int'l (<u>see</u> Visa Int'l at 3) and by MasterCard, which argues that American Express' claims must be dismissed because any harm suffered by American Express was caused solely by Visa By-law 2.10(e). <u>See</u> MC at 3, 7-8.

the statute of limitations begins to run only when plaintiff suffers injury, and applying same rule in RICO cases); <u>see also</u> <u>Bankers Trust Co. v. Rhoades</u>, 859 F.2d 1096, 1103-04 (2d Cir. 1988) (noting that antitrust statute of limitations begins to run only when the injury occurs, and applying same rule to RICO actions; cause of action "does not accrue until the plaintiff actually suffers that injury").[3]

Not only do the Association Defendants misstate the law, but they ignore their own judicial admissions, the Complaint's allegations, and this Court's Findings that American Express' efforts to partner with U.S. banks (and its consequent injury) began in 1996, not in 1991.

Before this Court and on appeal, the Association Defendants consistently asserted that American Express did not begin trying to partner with U.S. banks until 1996:

- "*For that matter, American Express never sought – nor even would have allowed – banks to issue cards on its network until its recent decision in 1996 to 'open' its network.*"   Defendants' Joint Proposed Findings of Fact, App. Exh. 1, at VII-1 (emphasis added).[4]

- Because of "AmEx's pre-1996 decision, as a unitary enterprise, not to license other issuers," consumers could not get American Express cards issued by banks "*until 1996 because AmEx had no interest in allowing it.*"  Visa USA Appellate Br., App. Exh. 4, at 41 (emphasis added).

It was at this point – not in 1991 – when the Exclusionary Rules, including MasterCard's Competitive Programs Policy ("CPP"), first injured American Express.  As the Complaint alleges, "[b]y 1996, in the United States, American Express had decided to invite Visa and MasterCard member banks to issue cards on the American Express network."  Compl. ¶ 99.

---

[3]  Visa USA (and Visa Int'l) ignore this well-established rule, just as Visa USA buried its sole reference to the <u>Zenith</u> case in an inapposite parenthetical at page 7 of its brief (<u>see</u> Visa USA at 7) and just as Visa USA fails even to acknowledge the Second Circuit decisions that apply it.

[4]  The Appendix ("App.") collects statements made by the Association Defendants establishing that American Express did not begin trying to partner with U.S. banks until 1996.

Less "than two months after CEO Golub's pivotal Credit Card Forum speech," however, "the colluding banks, including bank members of Visa, shut the door on competition from American Express by causing MasterCard to adopt an exclusionary rule," which "precludes any U.S. bank that issues MasterCard cards from also issuing American Express cards."  Compl. ¶ 13.  This chronology comes straight from this Court's Finding that "By 1996, however, American Express had decided to change its single-issuer network strategy and invited Visa and MasterCard member banks to issue cards on the American Express network."  163 F. Supp. 2d at 380.

Thus, absent tolling, American Express would have had four years from its injury in 1996 – i.e., until 2000 – in which to institute this action.  15 U.S.C. § 15b (four-year statute of limitations for private antitrust cases).  Of course, prior to 2000 the DOJ Case was filed, thereby tolling the statute of limitations during the pendency of that action and for one year thereafter:

> Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws . . . the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceedings shall be suspended during the pendency thereof and for one year thereafter.

15 U.S.C. § 16(i).   Because American Express' claims, based upon the injury it suffered beginning in 1996, had not expired when the DOJ Case was filed on October 7, 1998, this action could have been filed at any time within one year from the date the Court's judgment became final.[5]  For this reason alone, Defendants' statute of limitations argument fails completely.

*Second*, as the Association Defendants describe the Complaint, Visa Int'l took no actions in 1996 to advance the boycott of American Express (Visa Int'l at 3); MasterCard's CPP added nothing to the effectiveness of the boycott (MC at 7-8); and the Complaint does not adequately

---

[5] Such tolling applied not only to the parties to the DOJ Case, but also to unnamed co-conspirators.  See Zenith, 401 U.S. at 335.

plead a single conspiracy.  MC at 9.  It is hard to imagine a more distorted reading of the

Complaint, or of this Court's Findings.

1.      This Court found that in 1996 Visa Int'l "provided affirmative encouragement for

the illegal by-law," 183 F. Supp. 2d at 617; see also 163 F. Supp. 2d at 380, and in "June 1996

. . . delegated authority to the United States Region . . . to ensure the United States Region knew

the International Board supported a continuation of By-Law 2.10(e)."  163 F. Supp. 2d at 407.

The Court of Appeals upheld the finding of liability against Visa Int'l precisely because of that

1996 affirmative encouragement.  344 F.3d at 244.  The Complaint similarly alleges that this

communication was designed not only to ensure the continuation of By-law 2.10(e), but also to

invite the "extension of rules to bar competition from American Express" (Compl. ¶ 109) by

"signaling the intent of Visa and MasterCard member banks to complement Visa's exclusionary

rule with a parallel MasterCard rule."  Compl. ¶ 12.  This "encouragement" and signaling is an

actionable post-1995 overt act by a co-conspirator that restarts the statute of limitations.

2.      As for the CPP, the Findings establish and the Complaint alleges that the CPP

was a crucial component of the boycott.  In 1996, American Express announced the opening of

its network to U.S. banks and emphasized that, because MasterCard did not have an exclusionary

rule of its own, banks "could maintain card issuance through MasterCard while pursuing

opportunities with American Express."  Compl. ¶ 100; see also 163 F. Supp. 2d at 380

(American Express "specifically encourage[ed] major MasterCard banks to consider the

opportunity in light of the fact that MasterCard had no rule requiring them to give up their

MasterCard portfolio if they did so.").  What followed was a flood of interest on the part of

banks to issue American Express cards in the United States.  Compl. ¶ 101; see also 163 F. Supp.

2d at 380-81.

The association and bank conspirators quickly recognized that if MasterCard continued to operate without a counterpart to By-law 2.10(e), banks doing most of their business with Visa could defect to MasterCard, "convert their Visa portfolios to MasterCard," 163 F. Supp. 2d at 380, gain the freedom to partner with American Express, and cause the cartel to collapse. As a result, Visa Int'l encouraged the Visa and MasterCard conspirators to plug the hole, and three weeks later MasterCard "followed the [delegation] approach taken by Visa International's Board," 163 F. Supp. 2d at 381, and enacted the CPP. Thus, far from being superfluous, the CPP was essential to the success of the boycott. It was "because of the defendants' exclusionary rules" that "American Express and Discover have not been able to convince U.S. banks to issue cards over their networks." 163 F. Supp. 2d at 382 (emphasis added). The Court of Appeals agreed: "the exclusionary rules enforced by *Visa U.S.A. and MasterCard* have absolutely prevented Amex and Discover from selling their products at all." 344 F.3d at 243 (emphasis added). The Complaint spells these effects out in detail. See Compl. ¶¶ 116-26.

3.    The argument that the Complaint fails to properly allege a single conspiracy cannot be squared with the following: (a) the Complaint alleges a "single continuing combination and conspiracy to unreasonably restrain trade in the Relevant Markets," confirmed in the Findings and on appeal, Compl. ¶ 139; (b) the Court of Appeals found the "restrictive provision is *a horizontal restraint* adopted by 20,000 competitors," 344 F.3d at 242 (emphasis added); and (c) this Court found that the Exclusionary Rules were "of, by and for the member banks," 163 F. Supp. 2d at 400, that the member banks agreed not to compete by means of offering American Express and Discover branded cards, and that "such *an agreement* constitutes an unreasonable horizontal restraint," 163 F. Supp. 2d at 405 (emphasis added).

Moreover, contrary to the argument that American Express has not pleaded "plus factors" to support a single conspiracy, the Complaint and the Findings detail the extraordinary extent to which the Defendants sacrificed their independent interests to make the boycott conspiracy effective and durable. Thus, even though Visa and MasterCard competed with each other for bank business, MasterCard relinquished the opportunity to attract Visa banks in favor of having Exclusionary Rules that would "avoid loss of market share by the two networks that the members own." 163 F. Supp. 2d at 401; see also Compl. ¶ 5 (the Exclusionary Rules were adopted "to avoid loss of market share *by the two networks that the members own*") (emphasis in original; citations omitted); Compl. ¶ 115 (same). And even though the banks were competitors supposedly seeking to enhance their individual profits and market share at the expense of each other, the Exclusionary Rules were designed to "restrict competition at the network and issuer levels to enhance member bank profitability," 163 F. Supp. 2d at 401, and to ensure that "if *all* the members couldn't have the advantage of issuing American Express cards, *none would*." Id. at 330 (emphasis added); Compl. ¶¶ 5, 115 (same). Based on the Findings, the Complaint plainly alleges "plus factors," including how common bank ownership facilitated their single conspiracy. See In re Currency Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385, 419-20 (S.D.N.Y. 2003) (common bank ownership of Visa and MasterCard and allegation that currency fees were against banks' self-interest sufficient to support single inter-association conspiracy claim against associations and banks); see infra at 24-29.

In any event, whether the CPP was a separate agreement that operated to shore up By-law 2.10(e) for the benefit of both the MasterCard and the Visa banks, or was part of a single conspiracy to boycott American Express (which the Complaint alleges and the Findings support),

either constitutes an unlawful overt act that would have restarted the limitations clock in 1996 (had it begun to run).

The Association Defendants' other arguments similarly lack merit. They contend that there cannot be a conspiracy to monopolize unless its goal is to create a monopoly in a single entity; the plain language of the statute and controlling Supreme Court and Second Circuit precedent are directly to the contrary. <u>Infra</u> at 42-46. They contend that the Complaint fails to plead a proper debit market; but the Complaint alleges, as this Court found, a separate debit network services market from which American Express was excluded by the Exclusionary Rules. <u>Infra</u> at 47-50. And Defendants contend that the failure to plead the precise percentage of the market foreclosed by their dedication agreements, or the manner in which those agreements are not freely terminable, is fatal; but the allegations that foreclosure is substantial, is the product of an agreement to perpetuate the Exclusionary Rules, and has the requisite lockout effects make this an issue for discovery, not Rule 12(b)(6). <u>Infra</u> at 50-54.

## ARGUMENT

It is well-established that "a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases." <u>George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.</u>, 554 F.2d 551, 554 (2d Cir. 1977). Moreover, in ruling on a defendant's motion to dismiss an antitrust complaint, the Court must accept as true all allegations and draw all reasonable inferences in the plaintiff's favor; a motion to dismiss should thus be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College</u>, 128 F.3d 59, 63 (2d Cir. 1997) (citations and internal quotations omitted). For this reason, the Supreme Court has stated that in antitrust cases "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." <u>Hospital</u>

Building Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746 (1976).  Even at the summary

judgment stage, courts are bound to construe the evidence and reasonable inferences in the light

most favorable to the non-moving party.  Apex Oil Co. v. DiMauro, 822 F.2d 246, 253 (2d Cir.

1987) ("the question of what weight should be assigned to competing permissible inferences

remains within the province of the fact-finder at a trial") (cited at Visa USA at 16, MC at 12,13).

    The Association Defendants ignore each of these rules.  Indeed, the central characteristic

of their arguments is that they avoid, ignore, or reject the allegations in the Complaint and the

Findings as if they do not exist or are wrong.  Whether under the standards governing the

disposition of motions to dismiss or for summary judgment, or as a matter of stare decisis and

collateral estoppel, these motions must be denied.

## I.     AMERICAN EXPRESS' CLAIMS ARE NOT TIME-BARRED.

### A.     American Express' Claims Are Timely Because It Did Not Suffer Injury To Its Business Until 1996, Well Within The Limitations Period.

    As noted above, the DOJ Case tolled the four-year statute of limitations applicable to

American Express' damages claim for the pendency of that case, plus one year.  See 15 U.S.C.

§ 16(i).  Because the DOJ Case was filed on October 7, 1998, any American Express cause of

action that accrued after October 7, 1994 – and thus was still alive when the DOJ Case was

initiated four years later – was preserved by operation of law until one year after October 15,

2004, the date the Judgment became effective.  See October 21, 2004 Order in the DOJ Case.

    Since an antitrust damages claim does not accrue until the plaintiff suffers injury-in-fact,

and American Express first suffered such injury when the Defendants' Exclusionary Rules

blocked it from entering the U.S. network services business in 1996, American Express' claims

are timely.

1.    **An antitrust plaintiff's cause of action does not accrue – and the statute of limitations does not run – until plaintiff incurs actual injury-in-fact.**

An antitrust plaintiff's cause of action does not accrue – and therefore the limitations period does not begin – until the plaintiff suffers actual, non-speculative injury-in-fact to its business or property. Zenith, 401 U.S. at 338 ("Generally, a cause of action accrues and the statute [of limitations] begins to run when a defendant commits an act that injures a plaintiff's business."); see also 15 U.S.C. § 15a ("any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue"). The statute of limitations does not begin to run when a conspiracy is hatched or even when it is first put into place; rather, it only begins when "a plaintiff feels the adverse impact of an antitrust conspiracy." Zenith, 401 U.S. at 339. And to show that it has suffered such impact, an antitrust plaintiff "must show both an injury-in-fact to his 'business or property' and a causal connection between that injury and the defendant's allegedly illegal acts." Hecht v. Pro-Football Inc., 570 F.2d 982, 987 (D.C. Cir. 1977); see Donahue v. Pendleton Woolen Mills, Inc., 633 F. Supp. 1423, 1441-42 (S.D.N.Y. 1986) (relevant question is when "effects first were felt" and "manifested themselves"); Camotex, S.R.L. v. Hunt, 741 F. Supp. 1086, 1090 (S.D.N.Y. 1990) ("In general, a cause of action accrues, for statute of limitations purposes, at the time of 'injury.'"); Telectronics Proprietary, Ltd. v. Medtronic, Inc., 687 F. Supp. 832, 844 (S.D.N.Y. 1988) ("Because Telectronics would not be affected by Medtronic's [pre-limitations] acquisition of the patents until Medtronic attempted to assert them against Telectronics [during limitations period], its injury would probably be too speculative to confer standing until that time"; finding a disputed factual issue and denying summary judgment on statute of limitations grounds).

In fact, in drawing on the Clayton Act statute of limitations to address RICO statute of limitations issues, the Supreme Court recently confirmed that an antitrust cause of action does not accrue until the plaintiff actually suffers injury, describing <u>Zenith</u> as:

> A case in which this Court considered antitrust damages that were so 'speculative' or 'unprovable,' 401 U.S. at 339, at the time of a defendant's unlawful act (*and plaintiff's initial injury*) that to follow the normal accrual rule (*starting the limitations period at the point the act first causes injury*) would have left the plaintiff without relief.

<u>Klehr</u>, 521 U.S. at 190-91 (emphasis added).  The Supreme Court's reference to "the traditional Clayton Act 'injury' accrual rule," <u>id.</u> at 192, highlights that a private antitrust damages action does not accrue until the plaintiff suffers injury.

An example of this rule is found in <u>2361 State Corp. v. Sealy, Inc.</u>, 263 F. Supp. 845 (N.D. Ill. 1967), a case cited by <u>Zenith</u> regarding when an antitrust cause of action for damages accrues.  In <u>2361 State Corp.</u>, a supplier was informed in March that it was being terminated because the customer had entered into an exclusive dealing arrangement with Sealy.  The customer continued purchasing from the supplier, however, and it was not until August that the customer first declined to purchase from the supplier.  Confirming that "the statute of limitations commenced to run from the date on which the plaintiff first sustained injury," <u>id.</u> at 850, the court held that such injury occurred not when the exclusive agreement was made, but when the agreement impacted the plaintiff's business – that is, when purchases from it were actually stopped in August:

> When plaintiff was notified of Ward's decision not to enter into any future agreements to purchase bedding from the plaintiff, *it sustained no real injury* since Ward at that time and for many months thereafter continued to purchase bedding from plaintiff.  *Plaintiff had no right to maintain suit until it was in fact injured, and plaintiff sustained no injury as a result of the alleged exclusive dealing agreement until Ward put that agreement into effect by actually ceasing to purchase plaintiff's bedding.*

<u>Id.</u> at 851 (emphasis added).

10

The Association Defendants simply ignore this black letter law.  Instead, they repeatedly cite, out of context, a single sentence in Johnson v. Nyack Hosp., 86 F.3d 8, 11 (2d Cir. 1996) – "An antitrust cause of action accrues as soon as there is injury to competition" – to suggest that that alone is sufficient to start a particular plaintiff's statute of limitations.  Visa USA at 8.  The decision does not remotely stand for this proposition.  In Johnson the Second Circuit did not purport to reverse Zenith; indeed, the question of when the plaintiff's claim initially accrued was not even at issue because it was undisputed that the plaintiff was injured when the challenged action first occurred (through the revocation of plaintiff's hospital privileges).  As the district court opinion affirmed by Johnson makes clear, "'a cause of action immediately accrues'" when a "'plaintiff feels the adverse impact of [a] … conspiracy on a particular date.'"  Johnson v. Nyack Hosp., 954 F. Supp. 717, 720 (S.D.N.Y. 1997) (quoting Zenith, 401 U.S. at 339).

Defendants' reliance on Higgins v. NYSE, Inc., 942 F.2d 829 (2d Cir. 1991), is equally misplaced.  See Visa USA at 7.  Higgins expressly confirms what it called the "date-of-injury rule" – that the statute of limitations only begins to run when defendants' actions injure the plaintiff.  See id. at 832 (cause of action accrues when "'plaintiff feels the adverse impact of an antitrust conspiracy'") (quoting Zenith, 401 U.S. at 339).  Thus, Higgins has been cited for the proposition that a plaintiff may recover damages "resulting from an act outside the four year period whose effects first were felt within the statutory period"; that is, the statute of limitations does not run until defendants' actions adversely impact the plaintiff.  In re Nine West Shoes Antitrust Litig., 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000) (citing Higgins, 942 F.2d at 832).[6]

---

[6]  As the Court of Appeals has stated, "untoward consequences would follow were we to hold that the anticompetitive conduct itself triggered the running of the limitations period."  Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 295 (2d Cir. 1979), cert. denied, 444 U.S. 1093 (1980).  In Berkey, the Second Circuit noted that in a monopolization case, competitors "may" (or may not) be injured at the time the anticompetitive conduct occurs, but purchasers certainly are not injured until they actually make a purchase, and therefore suffer actual injury.  The basis of the distinction is simply the timing of the injury, as competitors may begin to lose sales immediately when the unlawful conduct occurs (such as in the predatory pricing example given by the Berkey court), but "purchasers

### 2. American Express does not allege – and did not suffer – injury from the Exclusionary Rules outside the limitations period.

#### a. American Express alleges antitrust injury that occurred beginning in 1996, within the limitations period.

The antitrust injury suffered by American Express arose when, following its invitation to Visa and MasterCard member banks in 1996 to issue American Express cards in the United States, those banks thereafter refused to enter into such arrangements. As the Complaint alleges:

- "By 1996, in the United States, American Express had decided to invite Visa and MasterCard member banks to issue cards on the American Express network." Compl. ¶ 99.

- "In May 1996 … [American Express CEO Harvey] Golub openly invited U.S. banks to join American Express in issuing consumer cards on American Express' worldwide network." Compl. ¶ 100.

- "Golub's speech immediately sparked strong interest among U.S. banks, several of which entered into discussions with American Express about issuing its cards." Compl. ¶ 101.

It was in direct response to these 1996 initiatives that the Association and Bank Defendants adopted the CPP and enforced Visa By-law 2.10(e). See infra at 24-29; Compl. ¶¶ 105-115. Because of these coordinated actions, until 2004 no U.S. bank had "broken rank" by accepting American Express' 1996 invitation to issue American Express cards. Compl. ¶ 120. It was thus not until 1996 – less than three years before the filing of the DOJ Case – that American Express "fe[lt] the adverse impact of [the] antitrust conspirac[ies]." Zenith, 401 U.S. at 339.[7]

---

are not, for they receive the temporary boon of artificially low prices. It is only when the monopolist, having devoured its smaller rivals, enjoys the spoils of its conquest by boosting its price to excessive levels that a purchaser 'feels the adverse impact' of the violation." Berkey, 603 F.2d at 295. Thus, Berkey confirms that actual injury is required, and that no cause of action accrues until a plaintiff "feels the adverse impact" of the unlawful conduct. Otherwise, a plaintiff's claim could expire before it accrued, which would make no sense.

[7] Even if American Express had suffered some injury before the limitations period, its cause of action with respect to damages would not have accrued because its damages would have been too speculative to recover. Ansul Co. v. Uniroyal, Inc., 448 F.2d 872, 884 (2d Cir. 1971) ("a plaintiff in an antitrust action may recover damages occurring within the statutory limitations period that are the result of conduct occurring prior to that period if, at the time of the conduct, those damages were speculative, uncertain, or otherwise incapable of proof"); see Zenith, 401 U.S. at 339 ("In these instances, the cause of action for future damages, if they ever occur, will accrue only on the

**b.    The Court's Findings confirm that American Express was injured in 1996, within the limitations period.**

Not only does the Complaint allege injury that occurred in 1996, but the Findings confirm the 1996 start date of American Express' injury.  For example, this Court found that "By 1996, however, American Express had decided to change its single-issuer network strategy and invited Visa and MasterCard member banks to issue cards on the American Express network." 163 F. Supp. 2d at 380.  It was only after this decision and the Defendants' anticompetitive response that banks broke off discussions with American Express, thereby injuring it.  From that point forward until 2004 "no bank has broken rank."  Id. at 400.

**c.    Defendants have admitted that American Express was not injured until 1996.**

Defendants have admitted – including before this Court and on appeal – that American Express had not entered, had not made efforts to enter, and had not even decided it wanted to enter the bank-issuer segment of the network services market until 1996.  The following are illustrative statements collected in the Appendix:

- "American Express never sought – nor even would have allowed – banks to issue cards on its network *until its recent decision in 1996 to 'open' its network*." Defendants' Joint Proposed Finding of Fact, App. Exh. 1, at VII-1 (emphasis added).

- "American Express had, earlier in the year [1996], adopted a strategy to get U.S. banks to partner with it to issue American Express cards in the United States and elsewhere."  Visa Int'l Proposed Supplemental Findings of Fact and Conclusions of Law, App. Exh. 2, at 29.

- Because of "AmEx's pre-1996 decision, as a unitary enterprise, not to license other issuers," consumers could not get American Express cards issued by banks "*until 1996 because AmEx had no interest in allowing it*."  Visa USA Appellate Br., App. Exh. 4, at 41 (emphasis added).

---

date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted.").  A claim by American Express for future damages prior to its decision to change business plans and enter the market would have been entirely speculative.

- "In 1996, long after Visa had adopted Bylaw 2.10(e), AmEx decided to change its longstanding business model in which it was the sole issuer and acquirer for AmEx branded cards."  Before The Subcommittee on Financial Institutions of the Committee on Banking, Housing, and Urban Affairs, 106th Cong., May 25, 2000 (Statement of Paul Allen, Executive Vice President and General Counsel Visa U.S.A. Inc.), App. Exh. 3, at 9.

It is the refusal of banks to issue American Express cards pursuant to an unlawful boycott that is the basis of American Express' claims and injury.  Because that injury did not occur until 1996 – well within the limitations period – American Express' claims are timely.[8]

> **3.    Defendants' reliance on documents created within the limitations period only highlights the lack of injury to American Express prior to the limitations period.**

Defendants ignore the Complaint, the Findings and their own admissions and instead argue that rather than bring an action within four years of March 15, 1991 (the date they erroneously argue marks the accrual of American Express' claims), American Express chose to lobby the government.  In so doing, they rely on submissions to the Justice Department and an amicus brief filed in another matter, two written in 1995 and one in 1996.  Visa USA at 4-5. Although these documents reflect the correct belief that Visa USA was engaged in anticompetitive conduct, they do not change the fact that actual injury sufficient to support a damages claim did not occur until the boycott injured American Express in 1996.[9]  Moreover, all these documents were written within the limitations period (which began in October 1994).

---

[8]  The situation here contrasts with the arguments made by the Association Defendants in the Discover case.  There, according to Visa, Sears was actually injured in 1991 by By-law 2.10(e) because in 1990 Sears had purchased a then-current Visa member (MountainWest) and "tried to use MountainWest's Visa membership to issue Visa cards."  Visa then adopted By-law 2.10(e) specifically "in response" to Sears' effort and "relied on both 2.06 and 2.10(e) in refusing to allow Sears, through MountainWest, to issue Discover cards."  Visa USA Feb. 7, 2005 Mem. in Support of Motion to Dismiss Discover's First Amended Complaint at 3-4 (citations omitted).  Thus, the predicate of Visa's statute of limitations argument against Discover is the actual injury alleged to have been suffered by Discover in 1991.  Id. at 10-11.  Here, Defendants do not identify (and American Express does not allege) *any* injury to American Express' business prior to 1996.

[9]  The May 19, 1995 amicus brief does not even mention By-law 2.10(e), and instead discusses the effect of a different Visa rule, By-law 2.06, and what American Express "may wish" to do in the future with bank partners. See Visa USA Exh. B at 12-13.  The February 3, 1995 letter to the Justice Department references "alliances" that

**B.    Even If A Cause Of Action Had Accrued Before The Limitations Period, Overt Acts In Furtherance Of Defendants' Continuing Unlawful Conduct Injured American Express Beginning in 1996, Within The Limitations Period.**

The Association Defendants do not dispute that an overt act in furtherance of a continuing conspiracy (such as Defendants' ongoing illegal boycott) restarts the statute of limitation where it inflicts new and accumulating injury on a plaintiff. E.g., Zenith, 401 U.S. at 338-39.[10] Nor do the cases cited by Defendants stand for a contrary proposition. Rather, Defendants make the astounding argument that nothing happened after 1995, or for that matter after 1991, that constituted an overt act in furtherance of the conspiracy. In other words, Defendants portray the adoption of By-law 2.10(e) in 1991 as the sole cause of injury to American Express, ignoring the actions of Visa Int'l, MasterCard, and other conspirators in 1996 and beyond. See, e.g., MC at 8 ("American Express has failed to allege any injury separate from that allegedly connected to the adoption of Visa's By-law 2.10(e).").

This is not a case, however, where Defendants simply adopted By-law 2.10(e) in 1991 and then sat back and did nothing further for the next 13 years. Nor is it even a case where all Defendants did was to recruit new conspirators and expand and enforce their conspiracy

---

banks "might be" interested in. See Visa USA Exh. A at 3. The only document that reflects a concrete plan to partner with banks, an actual effort to do so, and an injury suffered as a result of the Exclusionary Rules, is dated July 1, 1996, and refers explicitly to adoption of the CPP in response to the May 1996 Golub speech. See Visa USA Exh. C at 1 and 16. That injury occurred well within the limitations period.

[10]    See also Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 502 n.15 (1968), a damages action where defendant continued to refuse to sell certain equipment over a period of many years, and the defendant "advanced the argument that because the earliest impact on Hanover [plaintiff] of United's [defendant's] lease only policy occurred in 1912, Hanover's [plaintiff's] cause of action arose during that year and is now barred by the applicable Pennsylvania statute of limitations." The Supreme Court rejected this argument, concluding:

> We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on Hanover. Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955.

Id. (citations omitted).

15

(although that alone would be sufficient to defeat Defendants' current motions).  Instead, the Complaint and the Findings describe numerous overt acts taken to ensure that the boycott of American Express was successful from 1996 forward.  At least three of those acts clearly constitute separate, independently unlawful acts; two have already been found unlawful; and all of them constitute overt acts that restart the limitations period.

*First*, the Defendants, including Visa Int'l, acted to ensure that By-law 2.10(e) was maintained in the United States even if the European Union's objections blocked a similar rule in Europe.  As this Court found:  "In June 1996, the Visa International Board delegated authority to the United States Region, among others, to ensure that the United States Region knew the International Board supported a continuation of By-law 2.10(e)."  163 F. Supp. 2d at 407.  This 1996 action and the power to preempt By-law 2.10(e) established that "Visa International was in part responsible for the illegal rule."  183 F. Supp. 2d at 617.  The Second Circuit agreed that the "affirmative encouragement" offered by Visa Int'l for By-law 2.10(e) in 1996 was a sufficient basis on which "to premise liability."  344 F.3d at 244.  A necessary predicate to these liability findings is that the actions of Visa Int'l were important both to maintaining By-law 2.10(e) and continuing its enforcement, as the Complaint alleges and the Findings establish.  Compl. ¶¶ 12, 24, 108-109, 115; 163 F. Supp. 2d at 406-07; 183 F. Supp. 2d at 617; 344 F.3d at 244.  These actions by Visa Int'l and its co-conspirators are independently unlawful and alone are sufficient to make American Express' claims timely.

*Second*, only three weeks after Visa Int'l delegated authority to its regional boards to encourage the continuation of By-law 2.10(e), MasterCard – and the banks on its board, including some of the Bank Defendants – "followed" and passed the CPP.  163 F. Supp. 2d at 381; Compl. ¶¶ 110, 114-15.  These Defendants took this action at the invitation of, and with the

16

support of, the Visa Defendants and other Bank Defendants, and for the express purpose of boycotting American Express. Compl. ¶¶ 114-15; 163 F. Supp. 2d at 400. As this Court found and the Complaint alleges, this action had its intended effect, in conjunction with By-law 2.10(e), of blocking the efforts of American Express to participate in the U.S. network services market by competing for bank partners. Compl. ¶ 115; 163 F. Supp. 2d at 382. For this reason, this Court and the Court of Appeals found that the CPP, like By-law 2.10(e), was unlawful and a cause of direct injury to American Express. "The exclusionary rules enforced by *Visa USA and MasterCard* have absolutely prevented Amex and Discover from selling their products at all." 344 F.3d at 243 (emphasis added); see also 163 F. Supp. 2d at 382 ("*Because of the defendants' exclusionary rules* American Express and Discover have not been able to convince U.S. banks to issue cards over their networks.") (emphasis added). Adoption of the CPP was a further independently-unlawful action that made the boycott rules effective for both MasterCard and Visa, that furthered both the MasterCard and Visa conspiracies, and that occurred well within the limitations period.

*Third*, as alleged in the Complaint, 1996 was the year when the Defendants entered into an overarching unitary conspiracy to boycott American Express. Faced with American Express' efforts to enlist bank partners by taking advantage of the fact that MasterCard did not have its own counterpart to By-law 2.10(e), and seeing concrete evidence of banks' interest in such efforts, a comprehensive plan was needed. Compl. ¶¶ 114-15. The Complaint alleges a concerted response among all Defendants consisting of: (a) actions by Visa Int'l to maintain By-law 2.10(e) and to ensure its continued enforcement by Visa USA; (b) actions by Visa Int'l and the other Defendants to invite MasterCard and its banks to follow suit; (c) the prompt enactment of the CPP, in response to that invitation, facilitated by common bank ownership of the

17

associations; (d) the implementation of the conspiracy through discontinued negotiations with American Express and subsequent uniform adherence to the boycott; and (e) the shared goals of protecting the profitability of *all* the bank conspirators and the market share of *both* associations at the sacrifice of the individual interests of the individual banks and their individual associations.  Compl. ¶¶ 5-6, 10-14, 105-15.

This single conspiracy not only is an independent violation of the Sherman Act, but also is an overt act that restarts the statute of limitations.

*Fourth*, the Complaint alleges, and this Court found, other overt acts that occurred after 1996 and injured American Express.  These acts include the various refusals by individual banks to do business with American Express, which directly injured American Express and also reassured co-conspirators of their adherence to the boycott, Compl. ¶¶ 118-20; the adoption of dedication agreements as a way to perpetuate the effects of the Exclusionary Rules, Compl. ¶ 161; threats made to banks that were considering doing business with American Express, 163 F. Supp. 2d at 383-84 (Banco Popular);[11] and "using the association structure to reaffirm and extend the networks' exclusionary rules."  Compl. ¶ 105.  See, e.g., Western Shoe Gallery, Inc. v. Duty Free Shoppers, Ltd., 593 F. Supp. 348, 352 (N.D. Cal. 1984) (use of association "as a vehicle for keeping the conspiracy together" is overt act restarting limitations period).  Each of these actions injured American Express, as discussions with banks were broken off and as bank after bank refused to issue American Express cards pursuant to the boycott.[12]

---

[11] "'New and independent acts' may include active enforcement of policies first put into place outside the limitations period."  Red Lion Medical Safety, Inc. v. Ohmeda, Inc., 63 F. Supp. 2d 1218, 1223 (E.D. Cal. 1999).

[12] It does not matter which conspirators committed which particular acts, because "[i]njurious conduct in furtherance of a conspiracy committed within the limitations period ensures a timely cause of action against all members of the conspiracy."  Daniel v. American Board of Emergency Medicine, 988 F. Supp. 112, 122 n.8 (W.D.N.Y. 1997) (citing, e.g., Bankers Trust Co. v. Feldesman, 676 F. Supp. 496, 504 (S.D.N.Y 1987) ("each time a member of a conspiracy commits an overt act in furtherance of the [continuing civil] conspiracy, a cause of action accrues against all of the persons who are then members of the conspiracy for the damages caused by that act"),

Thus, American Express' claims are timely even under Defendants' standard for restarting the statute of limitations:

> [T]o restart the statute of limitations plaintiff must allege an overt act which (1) is a new and independent act that is not merely a reaffirmation of a previous act; and (2) inflict[s] new and accumulating injury on the plaintiff.

Visa USA at 10 (quoting <u>Vitale v. Marlborough Gallery</u>, No. 93 Civ. (PKL) 6276, 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994)).

> **1.    Defendants' efforts to portray their 1996 conduct as nothing more than an inertial reaffirmation of By-law 2.10(e) distorts beyond recognition the Complaint and the Court's Findings.**

The Association Defendants argue that there is nothing new or independent about these events because (a) the adoption of the CPP in 1996 added nothing that was not already effectively covered by By-law 2.10(e) (MC at 8); and (b) since By-law 2.10(e) was sufficient to effect the boycott of American Express, later events were a mere "reaffirmation" of the 1991 enactment of By-law 2.10(e).  Visa USA at 10.  Defendants' argument ignores the plain language of the Complaint and Findings.

*First*, Defendants recognized in 1996 that they could not get by without anything new.  If nothing new had been needed, Visa Int'l would not have needed to provide "support" and "encouragement" for the "continuation" and enforcement of By-law 2.10(e), Compl. ¶ 109, 163 F. Supp. 2d at 407; MasterCard and the banks would not have needed to pass the CPP, Compl. ¶¶ 114-15, 163 F. Supp. 2d at 380-81; and the Defendants would not have needed to create a single comprehensive boycott scheme to ensure that no leaks in the cartel might lead to its collapse.

*Second*, the Complaint and the Findings establish that MasterCard's actions, prompted by the invitations of its Visa co-conspirators, were not mere surplusage or redundancies.  As this

---

rev'd on other grounds sub nom. <u>Bankers Trust Co. v. Rhoades</u>, 859 F.2d 1096 (2d Cir. 1988), <u>cert. denied sub nom.</u> <u>Soifer v. Bankers Trust Co.</u>, 490 U.S. 1007 (1989)).

Court found: "In the absence of any MasterCard-imposed prohibition, [MasterCard President and CEO Eugene] Lockhart expected five to ten large MasterCard issuers around the world, including the United States, to issue American Express cards." 163 F. Supp. 2d at 381; see also Compl. ¶ 104 ("Lockhart and Alan Heuer, the President of MasterCard's U.S. Region, knew that a number of MasterCard member banks were considering issuing American Express cards."). This Court also found that Advanta, among others, would have issued American Express cards in the absence of MasterCard's CPP. See 163 F. Supp. 2d at 384 (finding that Advanta believed it "could have issued over three million American Express cards" when "MasterCard had no policy prohibiting such deals with its competitors"). And the CPP had the intended effect of reinforcing By-law 2.10(e). Indeed, an important premise of this Court's decision, and of the Court of Appeals' affirmance, was that *both* Rules were unlawful and *both* Rules together excluded American Express (and Discover) from doing any business with banks. See, e.g., 163 F. Supp. 2d at 382 ("*Because of the defendants' exclusionary rules* American Express and Discover have not been able to convince U.S. banks to issue cards over their networks.") (emphasis added).[13]

 *Third*, for precisely the same reasons, the individual banks' refusals to deal with American Express, which began within the limitations period, cannot be considered mere "reaffirmations" of By-law 2.10(e). As the Findings reflect, actions in addition to By-law 2.10(e) were important to ensure that the boycott of American Express was complete. Absent the CPP, for example, banks would have pursued deals with American Express. They did not because in 1996 the conspirators decided to close ranks by eliminating the MasterCard

---

[13] The effects of an ongoing policy or rule are not felt all at once but rather "each time [a plaintiff] is unable to sign a [customer]" because of that policy or rule. Red Lion, 63 F. Supp. 2d at 1224; see also Pioneer Co. v. Talon, Inc., 462 F.2d 1106, 1109 (8th Cir. 1972) (defendants' "continued refusals to deal caused new injury to Pioneer each time an order was refused").

loophole and adopting the CPP, and by actively enforcing By-law 2.10(e). Every refusal to deal thereafter was a new, independent overt act in furtherance of the conspiracy.

> **2.    The cases relied on by Defendants in no way alter the conclusion that American Express' claims are timely.**

Visa USA's heavy reliance on Vitale v. Marlborough Gallery, 1994 WL 654494 (S.D.N.Y. 1994), and In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188 (E.D.N.Y. 2003), is misplaced. (In any event, as set forth above, American Express easily meets the standard Visa USA attempts to pull from those cases for restarting the statute of limitations: new and independent acts that inflict new and accumulating injury.)

Vitale and Cipro are easily distinguishable from this case. In Vitale, the plaintiff clearly suffered injury before the limitations period because she was prevented by the challenged conduct from selling a painting in 1974 – two decades before she filed suit in 1993, and well outside the limitations period that began in 1989. 1994 WL 654494, at *4. In fact, she did not even attempt to sell her painting during the four years prior to filing the complaint. Id. As a result, the "plaintiff fail[ed] to allege an injury resulting from [any] acts" occurring during the limitations period. Id. Here, by contrast, American Express alleges both that it was injured by acts within the limitations period and that it attempted to do business with the banks during the limitations period but was precluded from doing so by the boycott.

In Cipro, the alleged harm arose solely from the fact that defendants had entered into settlement agreements more than four years prior to the lawsuit, pursuant to which certain defendants abandoned efforts to invalidate a patent; the only acts taken by any defendant during the limitations period were payments required by those agreements. 261 F. Supp. 2d at 229. The court held that such payments did not restart the limitations period. Id. The mere performance of a contract, of course, stands in stark contrast to this case, where within the limitations period a

new boycott rule was adopted, an existing boycott rule was reinforced, a new single conspiracy was hatched, and individual bank conspirators refused to deal with American Express.[14] Moreover, in Cipro the payments themselves had no anticompetitive effect; the anticompetitive act was the agreed abandonment of efforts to invalidate a patent.

More analogous than Vitale or Cipro is Driscoll v. City of New York, 650 F. Supp. 1522 (S.D.N.Y. 1987).  In Driscoll, plaintiffs alleged that defendants conspired to prevent plaintiffs from competing in the local tour boat market by entering into exclusive lease agreements that allegedly tied up a key pier facility.  The agreements were entered into in 1963 and 1965; plaintiffs sought and were denied docking privileges in 1982.  The court held that the statute of limitations clock did not run from when the exclusive contracts were executed, but when the defendants rejected plaintiffs' application for dockage.  The court dismissed the same argument that Visa USA makes here:  that the denial of dock space in 1982 "was merely a reaffirmation of a decision taken in 1965 – the inclusion of the restrictive covenant in the lease on pier 81." Id. at 1528.  Instead, the court held that "a cause of action accrued in plaintiffs' favor in 1982, at the time their application for docking privileges at the pier facility was denied." Id.

This is not a case in which American Express sought to have banks issue its cards in 1991 but they refused, and then many years later sought a reconsideration of that refusal.  Instead, American Express did not seek bank issuance until well within the limitations period; the first

---

[14]  Defendants' reliance on colorful quotes from Title VII cases – that "courts in the Second Circuit 'consistently have looked unfavorably on continuing violation arguments'" and  only 'compelling circumstances' will warrant application of [this] exception to the statute of limitations" – is misplaced.  Visa USA at 9.  As an initial matter, even if this standard were correct, Defendants' actions to injure American Express in 1996 and thereafter constitute "compelling circumstances."

Moreover, the cases from which the language was taken, Blesedell v. Mobil Oil Co., 708 F. Supp. 1408 (S.D.N.Y. 1989), and LaBeach v. Nestle Co., 658 F. Supp. 676 (S.D.N.Y. 1987), discuss a concept of "continuing violation" that is unique to Title VII cases and is different from what courts refer to as a "continuing violation" in the antitrust context.

refusal to deal was also within the limitations period; and the conspirators engaged in numerous acts within the limitations period to maintain, strengthen and extend the group boycott thereafter.

Accordingly, whether because American Express first suffered injury within the limitations period, or because Defendants committed various overt acts during the limitations period that injured American Express, American Express' claims are timely.

## II. THIS COURT'S FINDINGS, AFFIRMED ON APPEAL AND ADOPTED IN THE COMPLAINT, NOT ONLY SUPPORT BUT COMPEL THE CONCLUSION THAT A SINGLE CONSPIRACY EXISTED AMONG ALL DEFENDANTS TO EXCLUDE AMERICAN EXPRESS FROM THE NETWORK SERVICES MARKET.

The Association Defendants, led by MasterCard, contend that the Complaint's allegation of an overarching conspiracy to boycott American Express (Count III) fails as a matter of law. Specifically, Defendants claim that the Complaint: (1) fails to allege that MasterCard acted in concert with any other party, particularly Visa (MC at 10; Visa USA at 16; Visa Int'l at 4); (2) fails to allege facts from which a conspiracy can be inferred, such as "plus factors" like a common motive among the conspirators, or parallel conduct between the associations (MC at 12); (3) conflicts with this Court's ruling on the government's dual governance claim in the DOJ Case (MC at 13); and (4) by citing common bank ownership of the two associations, runs afoul of the Supreme Court's decision in Copperweld (MC at 13 & n.3). These arguments require a misreading of the Complaint and the Findings, as well as a misapprehension of controlling law.

### A. The Complaint Describes An Overarching Conspiracy, Orchestrated By The Defendants And Their Co-Conspirators, To Protect The Share Of The Two Associations And The Profits Of Member Banks By Boycotting American Express.

As alleged in the Complaint, the single conspiracy began in 1996 when, for the first time, American Express began to solicit U.S. banks to join its network and specifically invited MasterCard banks to take advantage of the fact that MasterCard did not then have a counterpart

23

to By-law 2.10(e).  Compl. ¶ 100; 163 F. Supp. 2d at 380-81.  Numerous banks responded

positively.  Compl. ¶¶ 101, 103, 104; 163 F. Supp. 2d at 380-81.

     <u>The Threat Posed By American Express.</u>  The Visa banks and their associations quickly

understood that if the American Express strategy worked, By-law 2.10(e) could collapse:  banks

doing a substantial share of business with Visa could defect to MasterCard to take advantage of

the MasterCard loophole, which in turn could force the repeal of By-law 2.10(e).  In particular,

members of MasterCard senior management believed that "MasterCard could differentiate itself

from Visa and gain share by *not* adopting a rule similar to Visa's 2.10(e)," which would

"*encourage banks interested in issuing American Express cards to convert their Visa portfolios*

*to MasterCard.*"  163 F. Supp. 2d at 380 (second emphasis added); <u>see</u> Compl. ¶¶ 99-100, 114-

15.  A plan was needed.

     <u>The Conspirators Implement An Expanded Conspiracy.</u>  The response was to save the

boycott by expanding support for By-law 2.10(e) and extending it in substance to MasterCard.

The first step was taken by Visa Int'l, which provided "affirmative encouragement" for the

"continuation of By-law 2.10(e)."  163 F. Supp. 2d at 407; Compl. ¶¶ 12, 109.  Not only was

such action necessary to keep By-law 2.10(e) intact but it also "signal[ed] the intent of Visa and

MasterCard member banks to complement [By-law 2.10(e)] with a parallel MasterCard rule."

Compl. ¶ 12.  The encouragement worked:  Visa USA maintained By-law 2.10(e); and only

three weeks later, MasterCard and its bank members accepted the invitation of Visa Int'l and its

conspirators by passing the CPP.  Compl. ¶ 110; 163 F. Supp. 2d at 381.  This Court found that

the passage of the CPP had its intended effect of perfecting the boycott scheme:  "The result, as

intended, has been that no bank has broken rank."  163 F. Supp. 2d at 400; Compl. ¶ 120.

MasterCard's argument that the five-year time period between the adoption of By-law 2.10(e) and the CPP somehow undermines the single conspiracy claim (MC at 11) ignores the facts and the Complaint.  It was not until American Express tried to partner with banks in 1996 that the crisis threatening the Visa cartel occurred, requiring its expansion in the form of the CPP, a single conspiracy and a cascade of refusals to deal by boycotting banks.  See Compl. ¶¶ 99-115.  In any event, "'a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.'"  United States v. Berger, 224 F.3d 107, 114-15 (2d Cir. 2000) (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990)); see also United States v. Martino, 664 F.2d 860, 876 (2d Cir. 1981) ("Nor does a single conspiracy become multiple conspiracies merely because a long period of time is spanned.").

The Conspirators Share Common Motives.  The Complaint, like the Findings, recites Defendants' common motives:  (1) to protect the market share of both associations which the bank members owned, Compl. ¶¶ 5, 115; 163 F. Supp. 2d at 401; and (2) to protect the profits of all banks by eliminating the competition to partner with American Express – competition that might leave some banks better off than those that were unsuccessful in securing an American Express partnership.  Compl. ¶¶ 5, 115; 163 F. Supp. 2d at 329-30 ("the direct purchasers of network services (the issuers) restrict competition among themselves by ensuring that so long as all of them cannot issue American Express or Discover cards, none of them will gain the competitive advantage of doing so").  As Defendants acknowledge (e.g., MC at 12), a "common aim or purpose" supports the finding of a single conspiracy.  United States v. Vanwort, 887 F.2d 375, 383 (2d Cir. 1989) (citation omitted); see also United States v. Beech-Nut Nutrition Corp.,

871 F.2d 1181, 1191 (2d Cir. 1989) ("A single conspiracy, rather than multiple conspiracies, may be found where the coconspirators had a 'common purpose.'") (citation omitted).

<u>The Conspirators Sacrificed Their Independent Interests to Implement The Conspiracy.</u> The Complaint, like the Findings, details the conspirators' actions against self-interest: the banks acted in absolute lockstep to forego business opportunities with American Express; and MasterCard, by aiding its bank conspirators to eliminate inter-bank competition, sacrificed the advantage it would have gained over Visa had it allowed its banks the freedom to partner with American Express. Compl. ¶¶ 113, 114. As the cases relied on by Defendants make clear, conduct against self-interest is a "plus factor" that can "exclude the possibility of independent parallel behavior" and support the finding of a conspiracy. <u>Apex Oil</u>, 822 F.2d at 254 (cited at MC at 12). Here, of course, the single conspiracy allegations are based on direct evidence (since the Rules themselves are an express agreement among competitors to boycott American Express) as well as circumstantial "plus factor" evidence.[15]

From the banks' perspective, and that of the associations they controlled, it was more important to preserve the profits of all banks and to protect the market share of "both associations" from erosion by American Express than to secure freedom for MasterCard to recruit banks that wanted to partner with American Express and to unleash banks that wanted to gain an advantage over their erstwhile competitors. The Court found that these actions against

---

[15] Plus factors identified by courts that support an inference of conspiracy "include a common motive to conspire, actions which were against [the conspirators'] own individual business interests absent an illicit agreement, and evidence of coercion." <u>In re Nasdaq Market-Makers Antitrust Litig.</u>, 894 F. Supp. 703, 713-14 (S.D.N.Y. 1995) (collecting cases). The Second Circuit has also found that "a high level of interfirm communications" is an additional "plus factor." <u>Apex</u>, 822 F.2d at 253-54. Thus, for example, in <u>United States v. Phelps Dodge Indus., Inc.</u>, 589 F. Supp. 1340 (S.D.N.Y. 1984), the court found evidence of parallel conduct and a common motive to conspire was sufficient to support an inference of an antitrust conspiracy. <u>See id.</u> at 1354-55. Here, the Complaint's allegations fit easily within this well-established analysis, as the Complaint alleges: (i) a common motive to conspire, <u>see</u> Compl. ¶¶ 5, 115; (ii) conduct against self interest, <u>see</u> Compl. ¶¶ 113, 115; and (iii) a high degree of interfirm communication, <u>see</u> Compl. ¶ 93.

self-interest demonstrated that "***Defendants' Real 'Justification' Was to Stop Competition from American Express and Discover***." 163 F. Supp. 2d at 400 (italics in original).

    <u>Common Ownership Facilitated Collusion.</u>  The Complaint also alleges that common bank ownership of the associations facilitated the exchange of information and the forging of a consensus to allow the conspirators to implement a successful boycott of American Express.  <u>See</u> Compl. ¶ 93 (quoting a 1992 letter from MasterCard International's Executive Vice President and General Counsel to the Department of Justice) ("'[W]hen one [association] board acts with respect to a matter, the results of those actions are *disseminated* to the members which are members in both organizations.  As a result, each of the associations is a fishbowl and officers and board members are aware of what the other is doing, much more so than in a normal corporate environment.'") (emphasis added); <u>see also</u> Compl. ¶¶ 88-93 (alleging facts about the governance and operation of Visa and MasterCard that provide opportunities for inter-association communication and coordination).  Where, as here, the conspirators admit that common ownership facilitates the exchange of information among the bank members, the existence of such an information conduit – together with direct evidence of the boycott in the form of the rules themselves and the agreement to abide by the rules, coupled with common motives, parallel conduct and actions against self-interest – only strengthens the inference of conspiracy.  <u>See, e.g.</u>, <u>In re Currency Conversion Fee Antitrust Litig.</u>, 265 F. Supp. 2d at 419-20 (plus factor of common bank ownership of Visa and MasterCard, together with parallel currency conversion fees, sufficient to raise inference of single inter-association conspiracy).

    <u>The Conspirators Provided Mutual Assurance Of Their Continuing Agreement To Abide By The Boycott.</u>  A single conspiracy also can be inferred from the fact that each bank had the assurance (as expressed in and enforced by By-law 2.10(e) and the CPP) that all banks would

adhere to the anticompetitive rules.  That assurance was well-founded.  As this Court found, "[t]he result, as intended, ha[d] been that no bank has broken rank."  163 F. Supp. 2d at 400; Compl. ¶ 120.  Mutual assurance of adherence to an unlawful scheme is the type of evidence upon which a unitary conspiracy can be based.  See generally Berger, 224 F.3d at 114-15.  Here, the "essential nature of the plan" was:  (i) all member banks could take comfort in the fact that no bank would gain an advantage over any other by doing business with American Express, since all agreed to, and did, abide by the Exclusionary Rules; and (ii) each association could shield itself and the other from competition by American Express in the network services market.

In sum, contrary to Defendants' argument (MC at 10-12), the Complaint and the Findings identify precisely:

- who the conspirators were;

- when, how, and why they implemented their single conspiracy to boycott American Express;

- the parallel actions in time and substance taken by the conspirators;

- the common motives shared by those conspirators in boycotting American Express;

- the sacrifice of the independent interests of association and bank conspirators made necessary by such conspiracy;

- the way in which common bank ownership facilitated the conspiracy; and

- the unbroken adherence of the conspiring banks to the agreement to abide by the Exclusionary Rules.

The Complaint thus not only meets but exceeds the pleading requirements in this Circuit. Indeed, these undisputed facts would satisfy even the most rigorous summary judgment standard. As in In re Visa Check/MasterMoney Antitrust Litig., "[t]here is evidence, direct and circumstantial, from which a jury could find a conspiracy [between the two associations]."

No. 96-CV-5238 (JG), 2003 WL 1712568, at *6 (E.D.N.Y. Apr. 1, 2003) (rejecting associations'

motions for summary judgment on single conspiracy claim); see also In re Currency Conversion

Fee Antitrust Litig., 265 F. Supp. 2d at 418-20 (refusing to dismiss inter-association conspiracy

claim where plaintiffs alleged common ownership of Visa and MasterCard, parallel conduct and

acts against banks' self-interest).

> **B.      This Court And The Court Of Appeals Made Express Findings That
> Support, If Not Compel, A Single Conspiracy Claim In This Case.**

Based on the foregoing evidence, both this Court and the Court of Appeals made express

findings that demonstrate the unitary nature of the conspiracy aimed at American Express:

> Visa U.S.A. and MasterCard, however, are not single entities; they are
> consortiums of competitors.  They are owned and effectively operated by some
> 20,000 banks, which compete with one another in the issuance of payment cards
> and the acquiring of merchants' transactions.  These 20,000 banks set the policies
> of Visa U.S.A. and MasterCard.  *These competitors have agreed to abide by a
> restrictive exclusivity provision* to the effect that in order to share the benefits of
> their association by having the right to issue Visa or MasterCard cards, they must
> agree not to compete by issuing cards of Amex or Discover.  *The restrictive
> provision is a horizontal restraint adopted by 20,000 competitors.*

344 F.3d at 242 (emphasis added).  The Court of Appeals' description of the conspiracy

frames Defendants' anticompetitive conduct as one integrated scheme.  It cannot be

ignored or brushed aside.

This Court's Findings, from which the Court of Appeals drew its holding, similarly

describe an all-bank conspiracy implemented through their associations:

> [T]here is substantial evidence that by adopting and enforcing the exclusionary
> rules, *the member banks agreed not to compete by means of offering American
> Express and Discover branded cards.*

163 F. Supp. 2d at 405 (emphasis added).  This Court therefore stated in summary that "such *an

agreement* constitutes an unreasonable horizontal restraint."  Id. (emphasis added).

29

These holdings underscore the unitary nature of the scheme implemented by the Bank Defendants through the two associations they own and control, which "served the same overriding goal," "shared common participants," "were mutually interdependent," and used the "same distinctive methods and means." Berger, 224 F.3d at 115. The Complaint expressly recites and relies upon these Findings in support of its single conspiracy claim. Compl. ¶¶ 5, 6; see also Compl. ¶ 133 (incorporating all prior allegations into Count III).

### C.    There Is No Basis For The Suggestion That Common Ownership "Tends" To Preclude Conspiracy Claims.

The suggestion by MasterCard that common ownership "tend[s] to preclude conspiracy claims because commonly owned entities cannot conspire with each other" (MC at 13) is irresponsible. No case "suggests" that competitors like the Bank Defendants and their co-conspirators can, as here, agree to eliminate competition among themselves by agreeing to abide by rules that implement a boycott of a competitor. The case law is replete with examples of conspiracies among competitors hatched in trade association contexts; none even hints that ownership of the associations by their members might immunize them from antitrust liability.[16] Indeed, this Court had no trouble finding that the bank co-conspirators had agreed to abide by the Exclusionary Rules, thus satisfying the agreement element of Section 1 of the Sherman Act. 163 F. Supp. 2d at 332, 400; see also 344 F.3d at 242.

---

[16]    See Federal Trade Comm'n v. Indiana Federation of Dentists, 476 U.S. 447, 459 (1986) (characterizing association rule as "a horizontal agreement among the participating dentists to withhold from their customers a particular service that they desire . . . ."); NCAA v. Board of Regents, 468 U.S. 85, 99 (1984) ("By participating in an association which prevents member institutions from competing against each other on the basis of price or kind of television rights that can be offered to broadcasters, the NCAA member institutions have created a horizontal restraint – an agreement among competitors on the way in which they will compete with one another."); National Soc. of Prof'l Eng'rs. v. United States, 435 U.S. 679, 692-93 (1978) (deeming association ethical cannon that effectively barred competitive bidding on the basis of price a horizontal restraint among the members); Associated Press v. United States, 326 U.S. 1, 15 (1945) (association by-laws that gave its competing-news-organization members the power to boycott the provision of news to non-member competitors violated the Sherman Act).

Not surprisingly, the Copperweld doctrine, to which MasterCard alludes, has never been applied in these circumstances, nor would it. Under Copperweld, corporations are not legally capable of conspiring with their wholly-owned affiliates. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984) ("the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act"). Even under this doctrine, courts have found that commonly owned competitors *are* legally capable of conspiring when no one owner holds more than 50% of the firms under common ownership.[17] None of these cases even remotely involves thousands of competing firms that agree to abide by rules of the competing associations they own in order to eliminate competition among themselves, as well as among their associations. To the contrary, In re Currency Conversion Fee Antitrust Litig. held that common ownership, parallel conduct and acts against banks' self-interests satisfied the pleading requirements for an inter-association conspiracy between Visa and its member banks and MasterCard and its member banks. 265 F. Supp. 2d at 418-20.

### D. The Court's Dual Governance Rulings Have No Bearing On The Allegations Of A Single Conspiracy To Boycott American Express.

MasterCard contends that this Court's decision on the government's dual governance claim somehow bars the single conspiracy claim. MC at 13. This argument badly misreads the Findings.

---

[17] See, e.g., Geneva Pharmaceuticals Tech. Corp. v. Barr Laboratories, Inc., 201 F. Supp. 2d 236, 274-75 (S.D.N.Y. 2002), rev'd in part on other grounds, 386 F.3d 485 (2d Cir. 2004); American Vision Centers, Inc. v. Cohen, 711 F. Supp. 721, 723 (E.D.N.Y. 1989).

*First*, the government's theory was that dual governance diminished the incentives of Visa and MasterCard to compete *with each other*. This theory did not purport to address the Exclusionary Rules and their effect on network competition from American Express.[18]

*Second*, in deciding Count I of the government's case, the Court did not even evaluate whether a single conspiracy existed with respect to dual governance. There was no need to do so because, as the Court itself recognized, "the Government alleges that dual governance is the result of separate conspiracies between each association and its members," not that there was a conspiracy "between the two associations." 163 F. Supp. 2d at 347.

*Third*, there is no inconsistency between the Court's dual governance decision and the Complaint's allegation of a single conspiracy involving the Exclusionary Rules. To the contrary, while the Court recognized that the associations (and their members) might be willing to compete *with each other* for bank members, they were nonetheless united in their opposition to allowing American Express to join such competition. Thus, the Exclusionary Rules not only barred member banks from competing with each other to partner with American Express, see 163 F. Supp. 2d at 405, they also eliminated competition between the associations to attract bank members based on how much freedom banks would have to partner with American Express. As the Findings demonstrate, MasterCard had the chance to compete with Visa on that basis, but sacrificed the opportunity to do so in order to protect the shares of *both associations* against erosion and to protect the profits of member banks. See supra at 5, 26.

*Fourth*, it is evident that the Court saw no inconsistency between its rejection of the government's dual governance theory and its unqualified determinations that the boycott of

---

[18]   The Court's decision was devoted to whether dual governance had so diminished the incentives of certain banks that they "pulled their punches" regarding association initiatives to shift share from one association to the other. See 163 F. Supp. 2d at 378. The Court saw no evidence of that in the voting patterns or skew of the banks, or in the competition for share between the two associations.

American Express eliminated competition at two levels – between the two associations themselves and among all of their banks – and that such boycott had *no* procompetitive or "legitimate business" objectives.[19]

### III. EVEN ABSENT A SINGLE CONSPIRACY, MASTERCARD'S CPP HARMED AMERICAN EXPRESS BY PREVENTING MASTERCARD BANKS FROM DOING BUSINESS WITH AMERICAN EXPRESS AND BY REINFORCING THE EFFECTIVENESS OF BY-LAW 2.10(E).

MasterCard argues that the Complaint must be dismissed as to MasterCard because American Express does not allege that it suffered any injury as a result of MasterCard's adoption of the CPP in 1996. MasterCard argues that because Visa and MasterCard have overlapping ownership, "virtually all" MasterCard banks already were prohibited from issuing American Express cards by reason of By-law 2.10(e), and thus the harm caused to American Express – its inability to have banks issue cards on the American Express network – was "present well before MasterCard adopted the CPP." MC at 8.

This argument is frivolous. The Complaint alleges (and this Court found) that if the CPP had not been adopted in 1996, several large *MasterCard banks* would have entered into card-issuing relationships with American Express. Compl. ¶¶ 101-04. The Complaint further alleges that the CPP was intended to and did have the effect of reinforcing By-law 2.10(e), thus foreclosing American Express from doing business with *Visa banks* that, absent the CPP, would have aligned themselves with MasterCard and done business with American Express. Compl. ¶¶ 114-15, 119. MasterCard is thus flat wrong when it argues that American Express has failed "to allege a cognizable causal link between CPP and its injury." MC at 8.

---

[19] MasterCard's suggestion that the Court's conclusions regarding the Government's dual governance claim somehow create "legitimate business objectives" regarding the Exclusionary Rules cannot be squared with this Court's categorical rejection of such justifications. Compare MC at 13 with 163 F. Supp. 2d at 400 ("Defendants' Real 'Justification' Was To Stop Competition From American Express And Discover") and 163 F. Supp. 2d at 406 ("defendants have offered no persuasive procompetitive justification" for the Exclusionary Rules).

MasterCard is also wrong that American Express must prove that the CPP caused injury that is "independent" of the injury caused by By-law 2.10(e). MC at 7. It is well-established that even two independently acting tortfeasors are jointly and severally liable for a plaintiff's injury when, as here, their separate tortious acts cause an indivisible injury. See infra at 37-39.

**A.    The Complaint Alleges, And The Findings Establish, That The CPP Injured American Express By Preventing American Express From Doing Business With *MasterCard Banks*.**

The Complaint alleges – and this Court found – that the CPP injured American Express by preventing American Express from entering into card-issuing relationships with MasterCard banks. As noted above (see supra at 12-14) in 1996, American Express for the first time openly invited U.S. banks to issue cards on the American Express network. Compl. ¶ 100; see also 163 F. Supp. 2d at 380 (same). Because no MasterCard exclusionary rule had yet been adopted, American Express specifically emphasized to banks that they "could maintain card issuance through MasterCard while pursuing opportunities with American Express." Compl. ¶ 100. American Express thus "outlin[ed] why it would be profitable for banks to partner with American Express and specifically encourage[ed] major MasterCard banks to consider the opportunity in light of the fact that MasterCard had no rule requiring them to give up their MasterCard portfolio if they did so." 163 F. Supp. 2d at 380.

The result was that several banks doing most of their business with MasterCard would have issued American Express cards in the United States if the CPP had not been adopted. In particular, the Complaint alleges that absent the CPP, "five to ten large MasterCard issuers around the world, including in the United States," would have accepted American Express' invitation and "would [have issued] American Express cards." Compl. ¶ 104. As this Court found, "*[i]n the absence of any MasterCard-imposed prohibition*, [MasterCard President and CEO Eugene] Lockhart expected *five to ten large MasterCard issuers* around the world,

including the United States, *to issue American Express cards*." 163 F. Supp. 2d at 381 (emphasis

added); see also Compl. ¶ 104 ("Lockhart and Alan Heuer, the President of MasterCard's U.S.

Region, knew that *a number of MasterCard member banks were considering issuing American*

*Express cards*") (emphasis added). Advanta, among others, would have issued American

Express cards in the absence of MasterCard's CPP. See 163 F. Supp. 2d at 384 (finding that

Advanta believed it "could have issued over three million American Express cards" when

"MasterCard had no policy prohibiting such deals with its competitors").

American Express was unable to enter into such bank relationships, however, because

Defendants "decided to close ranks" (Compl. ¶ 105) by "protect[ing] and extend[ing]" their

boycott of American Express through the CPP. Compl. ¶ 115. As the Complaint alleges,

Defendants adopted the CPP with the intention of preventing American Express from entering

into issuing relationships with *any* banks, including those banks that would have done business

with American Express without the CPP, and that the CPP had that effect:

> 'the evidence shows that MasterCard adopted its CPP in response to American
> Express' overtures to U.S. banks to issue American Express cards,' and that
> MasterCard's rule was motivated by a desire 'to restrict competition at the
> network and issuer levels to enhance member bank profitability,' 'to make sure
> that if all the members couldn't have the advantage of issuing American Express
> cards, none would,' and 'to avoid loss of market share by the *two networks that
> the members own*.'

Compl. ¶ 115 (quoting 163 F. Supp. 2d at 401) (emphasis in original).

Because the Complaint expressly alleges that, absent Defendants' adoption of the CPP,

several MasterCard banks would have entered into card-issuing relationships with American

Express, MasterCard is simply wrong to claim that American Express has failed "to allege a

cognizable causal link between CPP and [American Express'] injury." MC at 8.

**B.    The Complaint Alleges That The CPP Prevented The Circumvention Of By-law 2.10(e) By Visa Banks, And Thus Harmed American Express By Preventing It From Doing Business With *Visa Banks*.**

American Express does not allege that the CPP injured American Express merely by precluding certain *MasterCard banks* from accepting American Express' invitation to issue cards on the American Express network.  Instead, the Complaint alleges that the CPP also prevented the circumvention of By-law 2.10(e) by *Visa banks*, which otherwise would have had the option of moving their business to MasterCard while issuing American Express cards.

As demonstrated above, the Complaint alleges – based on the Findings – that without a MasterCard counterpart to By-law 2.10(e), banks doing most of their business with Visa could defect to MasterCard, gain the freedom to partner with American Express, and cause the cartel to collapse.  See supra at 5, 26; 163 F. Supp. at 380 (members of MasterCard senior management believed that "MasterCard could differentiate itself from Visa and gain share by *not* adopting a rule similar to Visa's 2.10(e)," which would "*encourage banks interested in issuing American Express cards to convert their Visa portfolios to MasterCard*") (second emphasis added).  For this reason, "Defendant Chase's representative to the MasterCard Board, who voted for the exclusionary rule, was 'absolutely adamant' that [a MasterCard] exclusionary rule was *needed to protect both the Visa and the MasterCard associations*, in which Chase had approximately equal shares."  Compl. ¶ 114 (emphasis added).  The CPP was thus enacted both to prevent MasterCard banks from doing business with American Express and (in aid of Visa) to remove the incentive of Visa banks to defect to MasterCard in order to gain the ability to partner with American Express.  That harm to American Express – its inability to do business with Visa banks that might otherwise have defected to MasterCard – was caused directly by the CPP.

**C.    Visa And MasterCard Are Jointly And Severally Liable For The Indivisible Injury Caused By The Exclusionary Rules.**

In addition to ignoring the Complaint and the Findings, MasterCard's argument is wrong on the law.  MasterCard contends that American Express must show an injury caused by the CPP that is "*independent of*" the injury caused by By-law 2.10(e).  MC at 7 (emphasis added).  But it is well-established that even two independently acting tortfeasors[20] are jointly and severally liable for a plaintiff's injury when their separate tortious acts cause an indivisible injury.  See Daggett v. Keshner, 14 Misc.2d 154, 156, 149 N.Y.S.2d 422, 425 (Sup. Ct. N.Y. County 1956) (where "two or more persons, even though acting independently of each other, united in causing an injury, they are joint tort-feasors and are jointly and severally liable for the resulting damages"), aff'd in part, rev'd in part, 6 A.D.2d 503, 179 N.Y.S.2d 428 (N.Y.A.D. 1st Dept. 1958); Restatement (Third) of Torts: Apportionment of Liability § 10, comment b (2000) (When more than one tortfeasor has caused an indivisible injury to the plaintiff, a "judgment should permit a plaintiff to recover the full amount of the recoverable damages … from any jointly and severally liable defendant."); Slotkin v. Citizens Co., 447 F. Supp. 253, 257 (S.D.N.Y. 1978) ("separate wrongs resulting in a single, indivisible injury, as here, create joint and several liability for the whole harm"), aff'd in part, rev'd on other grounds, 614 F.2d 301 (2d Cir. 1980); Ravo v. Rogatnick, 70 N.Y.2d 305 (1987) (jury unable to adduce the degree to which

---

[20]    MasterCard's argument, of course, assumes that Visa and MasterCard acted independently in adopting the Exclusionary Rules.  For the reasons discussed above, American Express has properly alleged that the Defendants were members of a single conspiracy to boycott American Express from competing for bank issuers in the United States.  As a co-conspirator with Visa and the Bank Defendants, MasterCard is liable for the entire injury suffered by American Express, even if (contrary to the allegations in the Complaint and the Findings) that injury was caused entirely by By-law 2.10(e).  See Hydrolevel Corp. v. American Soc. Of Mech. Eng'rs, Inc., 635 F.2d 118, 130 (2d Cir. 1980) ("since antitrust defendants are joint tort-feasors, each is liable to complete the total deserved damages irrespective of fault"), aff'd on other grounds, 456 U.S. 556 (1982).

defendants' separate acts of negligence contributed to brain damage of child at birth, which was thus a single indivisible injury).[21]

The Complaint alleges, based on the Findings, that the harm suffered by American Express – its complete foreclosure from partnering with U.S. banks – resulted from the *combined effects* of both Exclusionary Rules.  Absent the CPP, banks could have defected from Visa to MasterCard and issued American Express cards; absent By-law 2.10(e), banks could have defected from MasterCard to Visa and issued American Express cards; together, the Exclusionary Rules made successful a complete exclusion of American Express from bank partnership.  Compl. ¶¶ 116-26; see also 163 F. Supp. 2d at 382 ("*Because of the defendants' exclusionary rules* American Express and Discover have not been able to convince U.S. banks to issue cards over their networks.") (emphasis added); id. at 384 ("because of defendants' exclusionary rules," to issue American Express cards in the United States, Banco Popular "would have to give up its Visa *and* MasterCard memberships in the United States"; "[i]f the exclusionary rules did not exist," it would have issued American Express cards in the United States) (emphasis added); 344 F.3d at 243 ("the exclusionary rules enforced by *Visa U.S.A. and MasterCard* have absolutely prevented Amex and Discover from selling their products at all") (emphasis added); id. ("Amex, despite repeated recent attempts, has been unable to persuade any issuing banks in the continental United States to utilize its network services because the exclusivity rules would require such issuing banks to give up membership in the *Visa and MasterCard* consortiums, and banks are unwilling to do so.") (emphasis added).

Where, as here, the combined effects of the Exclusionary Rules caused a single injury to American Express – its complete exclusion from a segment of the network services market – the

---

[21] Antitrust violations are considered business torts.  See Zenith, 401 U.S. at 342-49 (recognizing that antitrust violation is a form of business tort); Hydrolevel, 635 F.2d at 130 ("antitrust defendants are joint tort-feasors").

Association Defendants are jointly and severally liable for the entire injury, even if they acted independently.

IV.    **VISA INTERNATIONAL WAS INSTRUMENTAL IN THE CONTINUATION OF BY-LAW 2.10(E), THE ADOPTION OF THE CPP AND THE IMPLEMENTATION OF THE SINGLE CONSPIRACY TO BOYCOTT AMERICAN EXPRESS.**

Visa Int'l argues that the Complaint fails to allege facts that tie it to the conspiracy to maintain and enforce By-law 2.10(e) or to adopt the CPP as part of a single conspiracy. Visa Int'l at 1, 3. Visa Int'l also contends that the Complaint fails to connect it to the horizontal agreement among the Defendants to adopt dedication agreements as a method of perpetuating the American Express boycott. Visa Int'l at 5. These arguments share the same flaws as MasterCard's.

A.    **The Complaint Specifically Alleges The Means By Which Visa International Participated In The Conspiracy To Maintain By-law 2.10(e), To Adopt The CPP And To Create A Single Conspiracy.**

The Complaint alleges that in 1996, Visa Int'l was an integral part of coordinated actions taken to thwart competition from American Express, including through a single conspiracy:

> [I]n June 1996, Visa International's Board delegated the authority to enact such restraints to Visa's regional boards, including Visa U.S.A., thereby . . . communicating to co-conspirators its support for Visa U.S.A.'s exclusionary rule, and signaling the intent of the Visa and MasterCard member banks to complement Visa's exclusionary rule with a parallel MasterCard rule.

Compl. ¶ 12; see also Compl. ¶¶ 106-110.

This Court found that, standing alone, Visa Int'l's providing "affirmative encouragement for By-law 2.10(e)," and delegating "authority to the United States Region, [in June 1996], to ensure that the United States Region knew the International Board supported a continuation of By-law 2.10(e). . . .," established Visa Int'l's participation in the unlawful boycott. 163

F. Supp. 2d at 407; see also 183 F. Supp. 2d at 617.  The Court of Appeals agreed when it affirmed Visa Int'l's liability under Section 1.  344 F.3d at 244.

As noted above, the Complaint alleges that Visa Int'l provided such encouragement for the purpose and with the effect of adopting a MasterCard rule that would complement By-law 2.10(e).  Compl. ¶¶ 12, 106-110.  Visa Int'l's encouragement of Visa USA's boycott rule, and its invitation to MasterCard to follow suit in the United States – all in the wake of American Express' effort to gain U.S. bank issuance – underscore Visa Int'l's pivotal role in a common scheme.  See Compl. ¶ 109 ("Visa International thus communicated to co-conspirators its support for the continuation and extension of rules to bar competition from American Express and, more specifically, its support for Visa U.S.A.'s continuation of by-law 2.10(e).").

These allegations place Visa International at the center of conspiratorial efforts to perfect the boycott of American Express through its support for By-law 2.10(e), the passage of the CPP, and the implementation of a single conspiracy.  The allegations are sufficiently detailed at the pleading stage, cannot be ignored, and do not require pleading of additional evidence.

**B.    As A Full Member Of The Conspiracy, Visa International Is Bound By The Actions Of Its Co-Conspirators So Long As It Remains A Member.**

Because Visa Int'l was a member of the conspiracies that targeted American Express, it is bound by and liable for actions by its co-conspirators in furtherance of those conspiracies, whether or not it participated in a specific act.  Pinkerton v. United States, 328 U.S. 640, 646-47 (1946); In re Mercedes-Benz Antitrust Litig., 157 F. Supp. 2d 355, 375 (D.N.J. 2001) ("[P]laintiffs have alleged that all of the named defendants were participants in the conspiracy.  That a particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy, such as attending a meeting, does not affect its status as a conspirator."); Pinney Dock & Transport Co. v. Penn Central Corp., 991 F. Supp. 908, 911 (N.D. Ohio 1998), aff'd,

196 F.3d 617 (6th Cir. 1999) ("Acts by different antitrust co-conspirators in furtherance of the conspiracy merely carry out the conspirator's agreement to restrain trade, and once a party takes the affirmative step of entering into an illegal conspiracy, that party is responsible for all the acts and consequent injury caused in furtherance of the conspiracy.").

Accordingly, even if Visa Int'l did not directly participate in voting for the actual adoption of By-law 2.10(e) or the CPP, it is liable for those acts and the consequences thereof as a member of the conspiracy. Similarly, because it was a full-fledged member of the conspiracy or conspiracies to boycott American Express, it is liable for the more recent adoption of dedication agreements as a method of perpetuating the boycott of American Express.[22]

### C.     Visa International Never Withdrew From The Conspiracies And Is Thus Liable For The Acts Of Its Co-Conspirators.

Visa Int'l could escape liability for the alleged conspiracies only if it could demonstrate that it had withdrawn from them.

> Membership [in a conspiracy] is presumed to continue until the last overt act by any of the co-conspirators, unless the defendant proves that the conspiracy was terminated or that he took affirmative steps to withdraw. See, e.g., Hyde v. United States, 225 U.S. 347, 369-70 (1912) . . . . Withdrawal is an affirmative defense, see, e.g., United States v. Eisen, 974 F.2d 246, 268 (2d Cir. 1992), cert. denied, 507 U.S. 1029 (1993), and the defendant has the burden of showing that he performed affirmative acts that were "inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." United States v. United States Gypsum Co., 438 U.S. 422, 464 (1978); mere cessation of activity is not sufficient . . . . Positive evidence of withdrawal is required in order to provide assurance that the defendant genuinely removed himself from the conspiracy and is not simply attempting an after-the-fact escape from liability. . . .

United States v. Flaharty, 295 F.3d 182, 192 (2d Cir. 2002) (additional citations omitted). Here, of course, neither Visa Int'l nor any other co-conspirator withdrew from the conspiracies, and

---

[22] In that regard, the Complaint incorporates by reference into Count V (which charges that dedication agreements were adopted as further horizontal restraints to boycott American Express) all of the paragraphs from the preceding Counts. See Compl. ¶ 149.

thus Visa Int'l remains liable for actions taken in furtherance of the conspiracy or conspiracies, whether taken before or after Visa Int'l joined them.  See, e.g., United States v. Rea, 958 F.2d 1206, 1214 (2d Cir. 1992) ("A defendant need not have joined a conspiracy at its inception in order to incur liability for the unlawful acts of the conspiracy committed both before and after he or she became a member.").

## V.    A CONSPIRACY TO MONOPOLIZE AMONG COMPETITORS IS ACTIONABLE.

### A.    American Express Does Not Have To Allege That Defendants Intended To Create A Monopoly In A Single Firm.

Visa USA contends that Amex has failed to state a conspiracy to monopolize claim because it has not alleged that the conspirators "specifically intend to create a monopoly for *one party*," and allegations that "parties conspired to create a shared monopoly or oligopoly do not satisfy the requirements of a Sherman Act Section 2 conspiracy claim."  Visa USA at 17 (emphasis in original).  Visa USA is wrong.

*First*, the relevant statute – Section 2 of the Sherman Act – has no such requirement: "Every person who shall . . . combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States" shall violate Section 2. 15 U.S.C. § 2.  That is a different offense than monopolization.  American Tobacco Co. v. United States, 328 U.S. 781, 788-89 (1946).

*Second*, the Supreme Court decisions on Section 2 conspiracy claims recognize no such limitation.  To the contrary, these cases have recognized or upheld such claims where multiple defendants shared the intent to increase or protect their *collective* share in or power over a market at the exclusion of their common rivals, even where they did not intend to create a monopoly in a single firm.  Thus, in American Tobacco, the Court endorsed the following instruction by the

trial court concerning, inter alia, a "conspiracy to monopolize trade with the power and intent to exclude actual and potential competitors from at least a part of the tobacco industry," id. at 788:

> Now, the term 'monopolize' as used in Section 2 of the Sherman Act ... means the *joint acquisition or maintenance by the members of a conspiracy formed for that purpose*, of the power to control and dominate interstate trade and commerce in a commodity *to such an extent that they are able, as a group, to exclude actual or potential competitors from the field*, accompanied with the intention and purpose to exercise such power.

Id. at 784-85 (emphasis added). The Court held that:

> A correct interpretation of the statute and of the authorities makes it [a] crime ... under § 2 of the Sherman Act, for parties, as in these cases, to combine or conspire to acquire or maintain the power to exclude competitors . . . provided they also have such a power that they are able, *as a group*, to exclude actual or potential competition from the field.

Id. at 809 (emphasis added). Nowhere in this case is there any suggestion that the defendants intended to create a single firm with monopoly power.

Likewise, in Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690 (1962), the Court ruled that a conspiracy to monopolize claim could be proved by showing that a group of defendants agreed not to sell ore to other potential producers, and to apportion and make other preferential arrangements among themselves. Id. at 693. Again, nowhere in the case was there a suggestion that defendants intended to create a monopoly in a single firm.[23]

The Second Circuit also recognizes that a conspiracy to monopolize involves the intent to acquire or maintain collective, not unitary, power. In United States v. Consolidated Laundries Corp., 291 F.2d 563 (2d Cir. 1961), the Court of Appeals clarified that "concerted action [among eight competing laundry companies] to drive independent non-cooperating linen suppliers out of

---

[23] See 370 U.S. at 709 (making clear that one way plaintiff could prove its Section 2 claim was by establishing that defendants conspired to monopolize the market together); see also Radovich v. National Football League, 352 U.S. 445 (1957) (upholding as sufficient to state a conspiracy to monopolize a complaint by a blacklisted football player alleging that the football leagues, teams and executives sought to monopolize professional football in the U.S. by boycotting the All-America conference and its players).

business" was "sufficient to support the conclusion that defendants had the specific intent to monopolize" the market within the meaning of Section 2.  Id. at 573.  Similarly, in International Distrib. Ctrs., Inc. v. Walsh Trucking Co., 812 F.2d 786 (2d Cir. 1987), the court rejected a conspiracy to monopolize claim because the plaintiff failed to establish that a "plurality of actors" shared an intent to monopolize the market, as required under Section 2.  Id. at 796. These and other recent decisions in this Circuit make clear that the touchstone of a conspiracy to monopolize is the intent to share *collective* power at the expense of common rivals.  None suggests that the defendants must intend to create a monopoly in a single firm.[24]  Indeed, one such decision held that a claim that *these very defendants* together conspired to monopolize the market for debit card services should proceed to trial.  In re Visa Check/MasterMoney Antitrust Litig., 2003 WL 1712568, at *8.

No case in this Circuit – including the cases cited by Visa USA – stands for the proposition that a conspiracy to monopolize claim requires that the conspirators intend to confer monopoly power on a single entity, and thus no case in this Circuit has dismissed such a claim on that basis.  Instead, the cases in this Circuit cited by Visa USA address "shared monopoly or oligopoly" only in the context of claims for *attempted* or *actual monopolization claims*, which, by the plain language of the statute, involve single-firm conduct.[25]  Thus, Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 256 (S.D.N.Y. 1995) (see Visa USA at 18), rejected the

---

[24]  In Kasada, Inc. v. Access Capital, Inc., No. 01 Civ. 8893 (GBD), 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004), Judge Daniels upheld a claim that a group of defendant credit institutions conspired to monopolize the markets for factoring of domestic garment manufacturers.  Specifically, plaintiff alleged that the defendants collectively factored 90% of the factored piece good vendors in the U.S., and were all members of two credit groups, through which they allegedly implemented their conspiracy.  Id. at *2.  The court found sufficient these and further allegations that defendants eliminated competition and worked together to control the business through various credit practices, and that such activities gave defendants "a dominant share" in the market, as well as the "power to drive manufacturers out of business."  Id. at *10.

[25]  See 15 U.S.C. § 2 ("Every person who shall monopolize, or attempt to monopolize … any part of the trade or commerce among the several States . . . .")

possibility that pleading a "shared" monopoly could satisfy the statutory requirements for a *monopolization* claim.[26]  Similarly, in Consolidated Terminal Systems, Inc. v. ITT World Communications (see Visa USA at 18), the court noted that to state a claim for *monopolization or attempted monopolization*, a plaintiff must "allege the necessary market domination of a particular defendant," which cannot be satisfied by alleging that defendants are an oligopoly or shared monopoly, which "does not in itself violate § 2."  535 F. Supp. 225, 228-29 (S.D.N.Y. 1982).  The decision did not even address much less support Visa USA's proposition.[27]

H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1018 (2d Cir. 1989), also lends no support to Visa's argument for grafting a "single monopolist" requirement onto a conspiracy to monopolize claim.  See Visa USA at 18.  Indeed, Hayden follows American Tobacco by holding that a conspiracy to monopolize may be established through evidence that the conspirators collectively possessed the "power and intent to exclude actual and potential competitors from at least a part of the [relevant market]," 879 F.2d at 1019, and simply affirmed the grant of summary judgment on that claim because there was insufficient evidence of the existence of the conspiracy to create a triable issue of fact.  Id.[28]

---

[26]  Indeed, Kramer states that a conspiracy to monopolize claim requires only that "a plaintiff must allege facts sufficient to support (1) concerted action; (2) overt acts in furtherance of the conspiracy; and (3) specific intent to monopolize."  890 F. Supp. at 255 (citing Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council, 857 F.2d 55, 74 (2d Cir. 1988)); see also Electronics Communic. Corp. v. Toshiba Amer. Consumer Prods., Inc., No. 96 Civ. 1565 (RPP), 1996 WL 455011, at *5 (S.D.N.Y.  Aug. 13, 1996) (same), aff'd, 129 F.3d 240 (2d Cir. 1997).

[27]  With respect to the conspiracy to monopolize claim, which alleged "in conclusory terms" that a group of five international record carriers conspired to monopolize the markets for international telex business and peripheral equipment, and that those five defendants held at least 98% of the relevant market, the court simply noted that the allegations were insufficient because they did not identify "any concerted activity or agreement to act in concert to achieve unlawful goals."  Consolidated Term. Sys. Inc., 535 F. Supp. at 229.

[28]  Visa USA also cites two district court decisions from other circuits; not only are they not precedential, but they offer no useful guidance.  In Phoenix Elec. Co. v. Nat'l Elec. Contr. Assoc., Inc., 867 F. Supp. 925 (D. Or. 1994), the court granted *summary judgment* to defendants on a claim that they conspired to monopolize a local market for commercial/industrial electrical construction.  Id. at 941.  In reaching this result, it relied on the Ninth Circuit decision in Harkins Amusement Enters., Inc. v. General Cinema Corp., 850 F.2d 477 (1988), believing incorrectly that Harkins had rejected a conspiracy to monopolize claim.  Id.  Visa USA is aware of this error, as it acknowledges that Harkins did not decide whether "a shared monopoly theory may be viable under some circumstances," 850 F.2d at 490.  See Visa USA at 18 n.17.  Compounding this error, Harkins itself states that only

45

### B.     A Section 2 Conspiracy Claim Is Not Duplicative Of A Section 1 Claim.

Visa USA also argues that a conspiracy to monopolize claim "would effectively duplicate" a conspiracy claim under Section 1. Visa USA at 18. To the contrary, "§§ 1 and 2 of the Sherman Act require proof of conspiracies *which are reciprocally distinguishable from and independent of each other* although the objects of the comparison may partially overlap." American Tobacco, 328 U.S. at 788 (emphasis added). Thus, the elements of a Section 2 conspiracy claim may be satisfied by any agreement between or among competitors (or between or among a competitor and non-market participants) to exclude rivals from "a part" of the market, whether or not that objective is achieved. Id. at 797-98. Noting Congress' intent and rationale for treating conspiratorial conduct more harshly than unilateral conduct, the Second Circuit has followed this reasoning. International Distrib., 812 F.2d at 795 n.8; see also Consolidated Laundries, 291 F.2d at 573.[29]

Consistent with this established law, Count IV of the Complaint alleges a conspiracy among all Defendants to monopolize the general purpose card network services market in the U.S., the requisite specific intent, the dominant market share of the conspirators, the implementation of such conspiracy through the Exclusionary Rules, and the resulting competitive harm. Compl. ¶¶ 80-84, 143-148.

---

one court had "squarely addressed" the issue as of that time – the Consolidated Terminal case in this district, where the court did *not* apply this reasoning to a Section 2 conspiracy claim. In Sun Dun, Inc. v. Coca-Cola Co., 740 F. Supp. 381 (D. Md. 1990), the court held that "*competitors*, by conspiring to maintain or create an oligopoly, do not run afoul of the Section 2 prohibition against monopoly," id. at 390 (emphasis in original), unless the aim of the conspiracy is to confer monopoly power upon a single entity. Id. at 391-92. It adopted this view in part on the mistaken belief that the question "whether *competitors* were capable of conspiring to monopolize was neither presented nor decided" in American Tobacco. Id. at 391 (emphasis in original). As discussed above, American Tobacco held otherwise and the Second Circuit is in accord.

[29]    The court in Kasada highlighted that conspiracies under Section 1 and under Section 2 are distinct when it refused to dismiss a Section 2 conspiracy claim even though the court dismissed the plaintiff's Section 1 claims. 2004 WL 2903776, at *8-9.

VI.    **THE COMPLAINT PROPERLY PLEADS AN ANTITRUST VIOLATION IN THE DEBIT CARD NETWORK SERVICES MARKET.**

Visa USA argues that Count V of the Complaint must be dismissed because it does not properly define a debit card network services market "from the perspective of *either* demand or supply substitution."  Visa USA at 21 (emphasis in original).  MasterCard does not join this argument, contending instead that American Express has not alleged that it was harmed by the CPP because the "plain language of CPP . . . limits its application to 'general purpose card programs' which does not include debit."  MC at 15.  Both arguments lack merit.

A.    **Count V Of The Complaint Properly Alleges The Debit Card Network Services Market Previously Found By This Court And In *In Re Visa Check/MasterMoney Antitrust Litigation*.**

It is well-established that a complaint properly pleads a relevant antitrust market when that market is "plausible" and bears a "rational relation" to the "methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity of demand."  Todd v. Exxon Corp., 275 F.3d 191, 200, 203 (2d Cir. 2001) (reversing the district court's dismissal of an antitrust complaint that alleged a "not implausible" relevant market of industry-specific employees).  As a result, and because "market definition is a deeply fact-intensive inquiry," courts hesitate to grant motions to dismiss for failure to plead a relevant product market.  Todd, 275 F.3d at 199-200 (citations omitted).

Even a cursory examination of Count V demonstrates that it satisfies these pleading requirements.  Count V defines debit cards as those that "promptly access money directly from a cardholder's checking or deposit account," and alleges that – from the perspective of demand – "[c]onsumers do not consider debit cards to be reasonably interchangeable with general purpose credit and charge cards."  Compl. ¶ 152.  The Complaint further defines debit card network services as "the market in which authorization, clearance and settlement services are performed

47

for debit card transactions" (Compl. ¶ 151), and alleges that Visa and MasterCard "dominate" (Compl. ¶ 154) and "have and exercise market power" (Compl. ¶ 153) in that market because, among other reasons, they "together control approximately 65 percent of the dollar value of all debit card transactions in the United States." Compl. ¶ 154. These allegations are more than sufficient to provide Defendants with the notice required by Fed. R. Civ. P. 8. <u>Karlinsky v. New York Racing Assoc.</u>, 52 F.R.D. 40, 43-44 (S.D.N.Y. 1971) (refusing to dismiss claim that defined the relevant market as "racing in New York State" because the "test of compliance with Rule 8 is whether the pleadings give *fair notice* of the claim asserted") (emphasis in original).

In fact, this market is precisely the same market already identified in the <u>DOJ Case</u> and in <u>In re Visa Check/MasterMoney Antitrust Litig.</u> In particular, this Court found that "[a]lthough debit cards are similar to credit and charge cards in that they may be used at unrelated merchants, the fact that upon use they promptly access money directly from a cardholder's checking or deposit account *strongly differentiates them from credit and charge cards*." 163 F. Supp. 2d at 331 (emphasis added). This Court further found that Visa USA and MasterCard had a "virtual monopoly" in the market for off-line debit card network services. <u>Id.</u> at 393.

In <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, the court actually granted summary judgment to the merchant plaintiffs on the issue of market definition, holding that:

> There is no genuine issue of fact regarding the relevant product market – the debit card services market. Contrary to the defendants' contention that the relevant market is all forms of payment, debit card services is a well-defined submarket characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole. *No rational jury could conclude otherwise*.

2003 WL 1712568, at *7 (citation omitted; emphasis added). Judge Gleeson also held that Visa's market share in the debit services market "satisfies any threshold showing" of a dangerous

48

probability of achieving market power, and that if it could be shown that Visa and MasterCard acted in concert that probability "could be satisfied as a matter of law." Id.

Finally, the argument that the Complaint fails to "explain why *any* supplier of network services cannot perform the authorization, clearance and settlement services" in the debit card network services market (Visa USA at 23) is simply remarkable.[30]  The Complaint alleges that Defendants "*have foreclosed American Express and all other potential competitors from providing debit card network services*."  Compl. ¶ 155 (emphasis added).  The Complaint thus explains why there cannot be supply substitution:  the Exclusionary Rules prevent it.[31]

For these reasons, there can be no serious argument that the Complaint fails to properly allege a debit card network services market.

> **B.    The Complaint Alleges That The Exclusionary Rules Caused Precisely The Same Harms In The Debit Card Network Services Market As Already Identified By This Court.**

The Complaint also properly alleges that MasterCard's CPP – like By-law 2.10(e) – harmed American Express in the debit card network services market.  In particular, the Complaint alleges that "[e]ntry into [the debit card network services] market is possible only through access to bank issuers," but that the Exclusionary Rules absolutely prevented American Express from accessing the banks.  Compl. ¶ 157.  By preventing such access, the Exclusionary

---

[30]  In making its market definition argument, Visa USA quotes from United States v. Aluminum Co. of Am., 377 U.S. 271, 283 (1964) (see Visa USA at 21), but fails to disclose that the quoted passage is actually from the dissenting opinion.  See 377 U.S. at 283 (Stewart, J., dissenting).

[31]  Visa USA appears to suggest that American Express must make allegations about both demand substitution and supply substitutability in order to properly plead a relevant market.  See Visa USA at 22 ("Even if American Express had properly alleged a 'debit card network services' market from the perspective of demand substitution . . . the allegations of a relevant market are inadequate from the perspective of supply substitution.").  That is a misstatement of the law:  "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes – analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible."  Todd, 275 F.3d at 200 (citations and quotations omitted).

49

Rules – including the CPP – "have foreclosed American Express and all other potential competition from providing debit card network services." Compl. ¶ 155.

These allegations, of course, mirror the Findings. As this Court found, competing to provide debit card network services requires access to bank issuers. 163 F. Supp. 2d at 393 (defining off-line debit service as requiring "account balance information supplied to the processor on a daily basis by the issuing member banks"). However, the Exclusionary Rules – both By-law 2.10(e) and the CPP – absolutely prevent access to bank issuers: "By forbidding their member banks from issuing competitors' general purpose cards, defendants' exclusionary rules thus foreclose the competitive threat that American Express and Discover otherwise might pose to that relationship card strategy." Id. at 392-393. As a result, American Express has been wholly unable to compete in issuing off-line debit cards: The Exclusionary Rules have "effectively foreclos[ed] American Express or Discover from competing to issue off-line debit cards." Id. at 329. MasterCard's claim that the Complaint fails to allege that MasterCard's CPP has harmed American Express in that market is without merit.

## VII. THE COMPLAINT PROPERLY PLEADS THAT THE ASSOCIATION DEFENDANTS HAVE VIOLATED SECTION 1 OF THE SHERMAN ACT BY EXTENDING THEIR BOYCOTT OF AMERICAN EXPRESS THROUGH DEDICATION AGREEMENTS.

The Association Defendants argue that American Express has failed to properly allege that their dedication agreements – pursuant to which banks "dedicate themselves to issuing all new cards exclusively from the association with which they have contracted" (Compl. ¶ 160) – violate Section 1 of the Sherman Act. According to the Association Defendants, American Express has failed to allege an exclusive dealing claim because certain dedication agreements may not require banks to move *all* of their pre-existing business to the contracting association (Visa USA at 24-25), and because an "exclusive dealing claim cannot be based on a contract that

50

is terminable by the party allegedly bound by the agreement." Id. at 25. The Association Defendants also argue that this claim must be dismissed because it alleges that Defendants have foreclosed a "substantial volume" of commerce, rather than a "substantial share" of the market. Id. at 26. And Visa Int'l contends that because this Court previously reviewed these agreements and "found them to be not *inherently* anticompetitive," American Express' claim that the dedication agreements are unlawful is "dubious." Visa Int'l at 6 (emphasis added).

Each of these arguments is without merit and, by relying on case law that applies to purely vertical agreements, fundamentally misapprehends American Express' claim concerning the dedication agreements. As the Complaint alleges, the dedication agreements "represent a *horizontal* conspiracy among Visa and MasterCard member banks . . . as well as agreements between Visa and its member banks and between MasterCard and its member banks" to "continue the boycott of American Express by, among other things, hindering member banks from issuing American Express general purpose cards." Compl. ¶ 161 (emphasis added). Dedication agreements – and in particular the financial inducements paid to member banks that enter into such arrangements – are funded through payments made "by *all* member banks, including those that do not have such exclusive arrangements." Compl. ¶ 160 (emphasis added). The reason that *all* member banks "agree to provide such support," even though only some of them are parties to dedication agreements, is because *all* member banks "receive the benefit of continuing the elimination of competition among each other based upon the actual or potential issuance of American Express general purpose cards by competing banks." Id.

The Complaint thus alleges that the Associations' dedication agreements constitute horizontal agreements to do indirectly what, following the DOJ Case, Defendants cannot do directly: prevent American Express from competing for bank issuance. The Association

Defendants do not even argue that American Express has failed to allege the elements of a horizontal boycott, effected through dedication agreements. Thus their arguments, which derive from case law addressing truly vertical (rather than horizontal) contractual relationships – and in any event would fail even if these were truly vertical agreements – miss the point.

For example, Defendants argue that the two-year rescission period contained in the final judgment of the <u>DOJ Case</u> – which this Court held was necessary because "the associations' past foreclosure of American Express and Discover from competing to enter into the agreements has greatly and impermissibly altered the competitive landscape," 163 F. Supp. 2d at 408 – somehow eliminated a cause of action relating to the agreements.[32] It is well-established, however, that the mere terminability of even a *purely vertical* agreement does not preclude an exclusive dealing claim where there are impediments to termination. <u>See, e.g.</u>, <u>Minnesota Mining & Mfg. Co. v. Appleton Papers Inc.</u>, 35 F. Supp. 2d 1138, 1144 (D. Minn. 1999) (refusing to grant defendant summary judgment even where exclusive contracts were on their face terminable at will because evidence suggested agreements were not terminable as a practical matter; "[w]hen ascertaining the characteristics of an exclusive dealing arrangement, courts look to the 'practical effect' of the agreement, not merely to its form"). Here, of course, the Complaint alleges precisely why the dedication agreements will not be terminated: they are the means through which the banks have extended the boycott of American Express. <u>See</u> <u>supra</u> at 51.

Defendants similarly argue that this claim must fail because the Complaint does not allege that the agreements are "truly exclusive." Visa USA at 24. Even with respect to purely vertical agreements, however, a plaintiff need allege only that the agreements substantially foreclose the plaintiff from the relevant market, not that the agreements are "truly exclusive."

---

[32] Of course, while government consent decrees or ordered injunctive relief "may have proscribed particular conduct and satisfied the public's interest, it may not have gone far enough to prevent further injury to the private plaintiffs." <u>Battle v. Liberty Nat. Life Ins. Co.</u>, 493 F.2d 39, 53 (5th Cir. 1974).

See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320 (1961) (holding that vertical agreements may violate Section 1 when they substantially foreclose the relevant market). Moreover, the Complaint alleges that the dedication agreements require banks "to dedicate themselves to issuing *all new cards exclusively* from the association with which they have contracted." Compl. ¶ 160 (emphasis added). Because a bank must give all of its new business to its association, Visa USA is just wrong that banks "are not prohibited from dealing with Visa's competitors." Visa USA at 24-25.

Defendants argue that this claim must be dismissed because it alleges that the exclusive agreements "foreclose a substantial volume of commerce from free and open competition" (Compl. ¶ 163), rather than a "substantial share" of commerce. Visa USA at 26.[33] No case, however, has held that a plaintiff must use the word "share" rather than "volume" in its complaint to adequately plead such a claim – particularly where the share of commerce foreclosed by the agreements is something only the Defendants know, and is thus an issue for discovery.[34] This argument also overlooks the Finding that "[b]ecause such agreements between issuers and Visa and MasterCard now predominate the market, American Express and Discover have been effectively foreclosed from a large portion of the card issuing market, and will continue to be so foreclosed for the duration of those agreements." 163 F. Supp. 2d at 408-09.

Finally, Visa Int'l states that this Court has already "found [the dedication agreements] to be not inherently anticompetitive," and thus that American Express' claim is "dubious." Visa Int'l at 6. It is not clear whether Visa Int'l is contending that is a reason to dismiss this claim,

---

[33] Because the Bank Defendants alone represent approximately 50% of all Visa and MasterCard network charge volume, a very small number of banks could easily foreclose a substantial portion of the relevant market. See Nilson Report (Jan. 2004).

[34] Indeed, in addressing the legality of certain vertical agreements, the Supreme Court has noted that the relevant question was whether the agreements "tend to foreclose a substantial *volume* of competition." Tampa Elec., 365 U.S. at 335 (emphasis added). The only cases cited by Defendants for this point are cases tallying market share on summary judgment, long after substantial discovery has already occurred. See Visa USA at 26 (citing cases).

but in any event the argument is without merit.  This Court's determination that dedication

agreements reflect competition *between* Visa and MasterCard for banks, <u>see</u> 163 F. Supp. 2d

at 369, 409, says nothing about whether the agreements are also a means through which the

Defendants have continued to boycott American Express from that competition.  There is

nothing inconsistent with the Defendants effecting a complete boycott of American Express from

a market while competing between themselves for business within that market.[35]

## <u>CONCLUSION</u>

The Association Defendants' motions to dismiss should be denied.


Dated:  February 21, 2005                              Respectfully submitted,




                                                       s/ Donald L. Flexner
                                                       _____
                                                       Donald L. Flexner (DF-4812)
                                                       Stephen R. Neuwirth (SN-5367)
                                                       BOIES, SCHILLER & FLEXNER LLP
                                                       570 Lexington Avenue, 16th Floor
                                                       New York, New York  10022
                                                       (212) 446-2300

OF COUNSEL:                                            David Boies (DB-4399)
Louise M. Parent, General Counsel                     BOIES, SCHILLER & FLEXNER LLP
Stuart Alderoty, Chief Litigation Counsel             333 Main Street
American Express Company                              Armonk, New York  10504
Three World Financial Center                          (914) 749-8200
New York, New York  10285

                                                       *Counsel for Plaintiff*


---

[35]  The Complaint expressly alleges that any benefits from such "Inter-Association Competition" between Visa and MasterCard "are outweighed by the harm to competition caused by the continuing boycott of American Express."  Compl. ¶ 162.