```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
AMERICAN EXPRESS TRAVEL            :
RELATED SERVICES COMPANY           :
                                   :      04 Civ. 8967 (BSJ)
              Plaintiff,           :
         v.                        :      Order
                                   :
VISA U.S.A., et al.,               :
                                   :
              Defendants.          :
------------------------------------X
```
**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

American Express ("Plaintiff") brings a claim against both named and unnamed defendants for allegedly conspiring "to extend and perpetuate the effects of their exclusionary rules, found unlawful by this Court, by agreeing to adopt and implement exclusive dealing arrangements with certain member banks." (Compl. at ¶ 160.)  Plaintiff claims that these exclusive dealing arrangements violate § 1 of the Sherman Act, which prohibits, in relevant part, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.

Both parties acknowledge that various members of Visa U.S.A., Inc. ("Visa") and MasterCard Incorporated ("MasterCard"), have entered into exclusive dealing arrangements ("EDAs") with Visa and MasterCard.  Plaintiff describes the EDAs as

multi-year contracts, extending up to ten years in duration, which obligate member banks to dedicate themselves to issuing all new cards with the association with which they have contracted, and requiring among other things that within a short period of time, such banks issue 80% to 90% of their general purpose cards as the contracting association's card."

(Compl. at ¶ 160.)

The banks named as defendants (collectively, the "Bank Defendants") have moved to dismiss Plaintiff's fifth claim pursuant to Federal Rule of Civil Procedure 12(b)(6) insofar as it relies on the EDAs. The Bank Defendants present two grounds for dismissal:

(1) Plaintiff fails to make out a claim of a horizontal conspiracy, and therefore cannot aggregate each EDA's market foreclosure amount to arrive at a figure large enough to ground an exclusive dealing claim. Because it relies on a theory of horizontal conspiracy, Plaintiff has failed to plead that any individual Bank Defendant's EDA forecloses a sufficient share of the market to violate § 1.

(2) The EDAs do not last for the extended period of time required for an exclusive dealing claim.

After reviewing the standard on a motion to dismiss, the Court will consider these arguments in turn.

**Standard on a Motion to Dismiss**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted," a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-moving party. Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999). The Court "may dismiss the complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

In the context of antitrust cases, motions to dismiss "prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." George Haug Co., Inc. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139 (2d Cir. 1998) (quoting Hosp. Building Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746, 96 S.Ct. 1848 (1976)). Thus while an antitrust plaintiff must "adequately define the relevant product market, . . . allege antitrust injury, [and] . . . allege conduct in violation of the antitrust laws," Sage Realty Corp. v. ISS Cleaning Servs. Group, 936 F. Supp. 130, 135 (quoting Re-Alco Indus. v. Nat'l Ctr. for Health Educ., 812 F. Supp. 387, 391 (S.D.N.Y. 1993)), it faces "no greater [burden] than the [one] faced by a plaintiff alleging any cause of action not covered by

the specific pleading requirements of Rule 9 of the Federal Rules of Civil Procedure." Gross v. New Balance Athletic Shoe, Inc., 955 F. Supp. 242, 244 (S.D.N.Y. 1997).

**Discussion**

In the most general terms, [e]xclusive dealing arrangements require a buyer to purchase products or services for a period of time exclusively from one supplier." ABA SECTION ON ANTITRUST LAW, 1 ANTITRUST LAW DEVELOPMENTS 214 (5th ed. 2002). Such agreements

> may, in some circumstances, create or extend market power of a supplier or the purchaser party to the exclusive-dealing arrangement, and may thus restrain horizontal competition. Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods, or by allowing one buyer of goods unreasonably to deprive other buyers of a needed source of supply.

Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 266 U.S. 2, 45, 104 S. Ct. 1551 (1984). On the other hand, exclusive dealing arrangements can promote healthy markets; for buyers they "may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand." Standard Oil v. United States, 337 U.S. 293, 306-07 (1949). By the same token, for sellers, exclusive dealing agreements "may make possible the substantial reduction of selling expenses, give protection against price fluctuations, and . . . offer the possibility of a

predictable market . . . They may be useful, moreover, to a seller trying to establish a foothold against the counterattacks of entrenched competitors." Id. at 307.

In Standard Oil, the Supreme Court applied what has been labeled the "quantitative substantiality test" to the government's exclusive dealing claims against Standard Oil, focusing almost exclusively on the amount of the market foreclosed by Standard Oil's exclusive dealing arrangements with various independent gas stations. Id. at 314. The Supreme Court later decided Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 334, 81 S. Ct. 623 (1961),[1] where it reaffirmed the

---

[1] In Tampa Elec., the Supreme Court addressed the plaintiff's claims brought under § 3 of the Clayton Act. That section provides:

> It shall be unlawful for any person . . . to . . . make a sale or contract for sale of goods . . . on the condition, agreement, or understanding that the . . . purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the . . . seller, where the effect of such . . . sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14. Plaintiff here has not asserted a claim under § 3 based on the EDs, presumably because § 3 reaches only arrangements dealing with "goods, wares, merchandise, machinery, supplies or other commodities," which are not at issue here. Id. The Court notes that in Tampa Elec., the Supreme Court stated that if an exclusive dealing arrangement "does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the [Sherman Act]." Tampa Elec., 365 U.S. at 335 (citing Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 608-609, 73 S. Ct. 872 (1953). Professor Hovenkamp explains that "a few courts have followed the rule suggested in Times-Picayune of applying a more aggressive test under the Clayton Act than under the Sherman Act, but most apply the same test under both statutes . . . Nevertheless, the cases are divided, with a likely majority stating that the Clayton Act requires a smaller showing of anticompetitive effects." Herbert Hovenkamp, Antitrust Law 2d ¶ 1800c4 (2005). See also Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291, 1304 (9th Cir. 1982) ( "a greater showing of anticompetitive effect is required to establish a Sherman Act violation than a section 3 Clayton Act violation in exclusive-dealing cases").

pro-competitive potential of exclusive dealing agreements and applied a qualitative test to the plaintiff's exclusive dealing claim. The Supreme Court cited the following considerations:

> structure of the market for the products or services in question . . . the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on competition therein.

Tampa Elec., 365 U.S. at 329.

Since Tampa Elec., exclusive dealing agreements are "judged under the Rule of Reason, and [are] condemned only if found to restrain trade unreasonably." Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 393 (7th Cir. 1984). Thus "in order not to condemn the positive aspects of exclusive dealing agreements, courts must take care to consider the competitive characteristics of the relevant market." Geneva Pharm. Tech. Corp. v. Barr Lab. Inc., 386 F.3d 485, 508 (2d Cir. 2004). See also Am. Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1251 (3d Cir.1975) (Courts must therefore conduct a "broad inquiry," in order to "take into account the economic justification for the arrangement").

An additional factor to those cited by the Supreme Court in Tampa Elec. is "the duration and terminability of the arrangement: the shorter an agreement's term and the easier it

is to terminate, the more likely that it will be upheld . . . In fact, courts increasingly view at-will exclusive arrangements as presumptively valid." Minnesota Mining, 35 F.Supp.2d at 1143. Other relevant considerations include "ease of entry" into the market, "the extent to which competitors also employ exclusive dealing arrangements, the relationship between the parties to the exclusive dealing arrangement, and the extent to which competition is actually injured." ABA SECTION ON ANTITRUST LAW, 1 ANTITRUST LAW DEVELOPMENTS 224-25 (5th ed. 2002).

Nonetheless, even after Tampa Elec., the degree to which an agreement forecloses the market remains arguably the most important factor in determining whether the agreement violates § 1. In Jefferson Parish, the most recent exclusive dealing case to reach the Supreme Court, the Court held that "[e]xclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal." Jefferson Parish, 266 U.S. at 45. Generally speaking, cases construing Jefferson Parish have held that an agreement must foreclose at least 30 percent to 40 percent of the market to support a § 1 violation, and one treatise advises that there thus exists a "virtual safe harbor . . . for market foreclosure of 20 percent or less." ABA SECTION ON ANTITRUST LAW, 1 ANTITRUST LAW DEVELOPMENTS 222 (5th ed. 2002). See, e.g., T.A.M., Inc. v. Gulf Oil Corp., 553 F. Supp. 499, 505

(E.D.Pa. 1982); Minnesota Mining and Manuf. Co. v. Appleton Papers Inc., 35 F.Supp.2d 1138, 1143 (D.Minn. 1999); United States v. Microsoft Corp., No. 98-1232, 1998 U.S. Dist. LEXIS 14231, at *61 (D. D.C. 1998).

### *The Bank Defendants' Motion to Dismiss*

With these general standards in mind, the Court turns to the issues raised by the Bank Defendants' motion to dismiss. The Bank Defendants' primary attack is that Plaintiff fails to state a claim for a horizontal conspiracy among the defendants, and therefore "may not aggregate the effects of all of the Visa or MasterCard dedication agreements in asserting an exclusive dealing claim against an individual bank." (D. Mem. at 5.) The Bank Defendants also argue for dismissal of the exclusive dealing claim because, pursuant to the Court's opinion in United States v. Visa U.S.A., Inc., 183 F.Supp.2d 613 (S.D.N.Y. 2001), the EDAs are terminable at will, and therefore will not last the extended period of time required for an exclusive dealing claim.

### *Horizontal Conspiracy*

Plaintiff faces no additional pleading requirements by virtue of the fact that this is an antitrust case. Indeed, "a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,

554 F.2d 551, 554 (2d Cir.1977). To make out a § 1 conspiracy claim, a plaintiff must allege three things: "(1) concerted action, (2) by two or more persons that (3) unreasonably restrains trade." In re Nine West Shoes Antitrust Litigation, 80 F.Supp.2d 181, 190 (S.D.N.Y. 2000).

The Bank Defendants argue that Plaintiff has failed to satisfy its obligation to "do more than merely allege that a conspiracy exists," but rather "provide some factual basis for that allegation." Granite Partners, 58 F. Supp. 2d at 238. The Bank Defendants argue that as a result, for the Court to find that Plaintiff states a claim for horizontal conspiracy, it must adopt a "walking conspiracy" view of the Association Defendants.

Under a walking conspiracy theory, every action undertaken by either Visa or MasterCard would be the equivalent of concerted action by each individual member. But the Second Circuit has rejected the concept of "membership-ratification theory as a basis for antitrust conspirator liability," holding that "every action by a trade association is not concerted action by the association's members." AD/SAT v. Associated Press, 181 F.3d 216, 234 (2d Cir. 1999) (citing Wilk v. Am. Medical Ass'n, 671 F. Supp. 1465, 1492 (N.D. Ill. 1987), aff'd, 895 F.2d 352 (7th Cir. 1990)). The Second Circuit reasoned that "a finding of concerted action based on the defendants' status as members of the [association] would seriously undermine the

standards articulated by the Supreme Court in Matsushita and Monsanto." Id. (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986) and Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S. Ct. 1464 (1984)). Under Matsushita and Monsanto, "an antitrust plaintiff must present evidence tending to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." Id. The Second Circuit therefore rejected the use of "a 'walking conspiracy' theory in place of such a showing." Id.

The Bank Defendants also rely on Kendall v. Visa, U.S.A., Inc., No. 04 Civ. 4276 (JSW) (N.D. Cal. 2005), where Judge White recently dismissed the plaintiffs' § 1 claims against two member banks of Visa and MasterCard,[2] because their complaint made "no allegations that, as part of the Bank Defendants' participating in the management of, or their proprietary interest in, VISA or MASTERCARD, the Bank Defendants 'knowingly, intentionally and actively participated in an individual capacity in the alleged scheme' to fix the interchange fee or merchant discount fee." Kendall v. Visa, U.S.A., Inc., No. 04 Civ. 4276 (JSW), at 3-4 (N.D. Cal. 2005). Having reviewed the complaint from Kendall, the Court finds that it is indeed devoid of any mention of the

---

[2] The plaintiffs in Kendall alleged that the associations' setting of merchant discount fees constitutes a horizontal price fixing arrangement in violation of § 1.

individual defendants' intentional involvement in the horizontal price-fixing scheme allegedly orchestrated by them, Visa and MasterCard. The only allegations the <u>Kendall</u> plaintiffs directed towards the member banks were that the banks "obtain supracompetitive profits by assessment of merchant discount fees on the deposits of Plaintiffs," and that "member banks of both VISA and MASTERCARD find it economically to their advantage not to opt out of systems which establish a non-competitive merchant discount." (Kendall Compl. at ¶¶ 10, 11.)

By contrast, Plaintiff here alleges that the Bank Defendants engaged in concerted action to exclude Plaintiff from the relevant market. The complaint alleges that the Bank Defendants, "in collaboration with" the Association Defendants and other unnamed member banks, have supported the EDAs, and that they do so "because they receive the benefit of continuing the elimination of competition among each other based upon the actual or potential issuance of American Express general purpose cards by competing banks." (Compl. at ¶¶ 161, 160.) At oral argument, counsel for Plaintiff clarified that when it alleges that banks have "supported" other member banks' EDAs, it means that those banks "have voted for the procedure of the dedication agreements, and have voted to subsidize those agreements." (4/14/05 Tr. at 60.) Thus even banks without EDAs participate in the conspiracy to restrain trade "by agreeing to subsidize

those banks that do, because it has the effect of continuing the horizontal constraint."  Id. at 61.  The unreasonable restraint of trade, according to the complaint, consists of "the harm to competition caused by the continuing boycott of American Express," a harm that outweighs any benefits accruing from "competition between Visa and MasterCard to sign member banks" to EDAs.  (Compl. at ¶ 162.)  Finally, the complaint alleges that the EDAs "foreclose a substantial volume of commerce from free and open competition."  (Compl. at ¶ 163.)

Based on these allegations, the Court cannot conclude that Plaintiff can prove no set of facts in support of its claim that the Bank Defendants each "consciously committed themselves to a common scheme designed to achieve an unlawful objective," here, the boycott of American Express through a restraint of trade. AD/SAT v. Associated Press, 181 F.3d at 234.  Plaintiff has satisfied the pleading requirements for a horizontal conspiracy under § 1, and does so without relying on the "walking conspiracy" theory rejected by the Second Circuit.[3]  Plaintiff therefore need not allege that any individual EDA forecloses enough of the relevant market to violate that section.

---

[3] Because the Court finds that Plaintiff has stated a claim for a horizontal conspiracy, it does not reach the issue of whether, without such a conspiracy, Plaintiff can aggregate the portion of the market foreclosed by each individual EDA in order to show that a "significant fraction of buyers and sellers are frozen out of a market."  Jefferson Parish, 466 U.S. at 45.

Accordingly, the Bank Defendant's motion to dismiss the exclusive dealing claim based on market foreclosure is denied.

### *The Terminability of the Exclusive Dealing Arrangements*

The Bank Defendants also argue for dismissal of Plaintiff's exclusive dealing claims based on the fact that according to the Court's order in United States v. Visa U.S.A., Inc., 183 F.Supp.2d 613 (S.D.N.Y. 2001), the EDAs are terminable at will by the member banks. That order provides the following injunctive relief:

> In the event that any issuing member enters into an agreement to issue American Express or Discover brand payment cards on those respective networks . . . Defendants Visa U.S.A. and MasterCard shall permit that issuer to terminate, without penalty, any agreement it entered into with that Defendant prior to the effective date of this Final Judgment, pursuant to which the issuer committed to maintain a certain percentage of its general purpose card volume, new card issuance or total number of cards in force in the United States on that Defendant's network.

United States v. Visa, U.S.A., Inc., 183 F. Supp. 2d at 618. The Bank Defendants point to case law upholding exclusive dealing arrangements with "reasonable termination provisions," arguing that because the Court's injunction allows banks to terminate their EDAs at will, Plaintiff's exclusive dealing claim fails as a matter of law. (Def. Br. at 6.)

The Bank Defendants rely primarily on Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994), where the Second Circuit rejected the plaintiff's exclusive dealing claim. In Balaklaw, the

plaintiff, an anesthesiologist, claimed that a hospital "violated the Sherman Act by entering into an exclusive contract with a group of anesthesiologists of which Dr. Balaklaw was not a member." Balaklaw, 14 F.3d at 795. The Second Circuit dismissed this claim because it found no "foreclosure of competition" and therefore no antitrust injury. Id. Under the agreement at issue, the hospital "was free at the end of six months to enter into a new arrangement with either [the current group] or with any other anesthesiologist." Id. The court explained that "[s]uch a situation may actually encourage, rather than discourage, competition, because the incumbent and other, competing anesthesiology groups have a strong incentive continually to improve the care and prices they offer in order to secure the exclusive positions." Id.

As in Balaklaw, agreements "providing short notice for termination" are often upheld. ABA SECTION ON ANTITRUST LAW, 1 ANTITRUST LAW DEVELOPMENTS 225 (5th ed. 2002). See, e.g., Western Parcel Express v. UPS of Am., 190 F.3d 974, 976 (9th Cir. 1999) (rejecting the plaintiff's exclusive dealing claim in part because "the challenged contracts had termination provisions that allowed a customer to terminate the contract for any reason with very little notice"); CDC Techs., Inc. v. IDEXX Lab., Inc., 186 F.3d 74, 81 (2d Cir. 1999) (finding it "highly significant" that the exclusive dealing agreements at issue "were easily

terminable on short notice" in rejecting plaintiff's exclusive dealing claim).

An agreement's duration, however, is not dispositive of whether it violates § 1. Indeed, courts have held that even if an exclusive dealing contract is terminable at will, it can still operate as an unreasonable restraint on trade. For example, in Minnesota Mining & Manuf. Co. v. Appleton Papers, Inc., 35 F.Supp.2d 1138 (D.Minn. 1999) ("3M"), the district court denied the defendant's motion for summary judgment on an exclusive dealing claim, despite the fact that the agreements at issue, "sole-source" relationships between the defendant and various paper merchants, were terminable at will. The complaint alleged that by "saturating local markets with these agreements," the defendant "increased its market share by blocking its rivals' avenues of distribution." 3M, 35 F.Supp.2d at 1140. In its motion for summary judgment, the defendant argued that because the agreements were terminable at will, its competitors remained "free to attempt to convert exclusive distributors," and therefore the agreements did not violate § 1. Id. at 1144.

Citing Tampa Elec., supra, the district court focused on "the 'practical effect' of the agreement, not merely its form," and found a genuine issue of fact as to whether or not the agreements were indeed terminable at will. The plaintiff

pointed to evidence indicating that the "agreements often include incentives that have the practical effect of tying up the paper sheet inventory of a merchant over a period of several years." Id. Moreover, there existed "unique distribution factors, like the high costs a paper merchant must incur to switch completely from one brand to another, that make it very difficult for a supplier to dislodge a competitive brand from an exclusively dealing merchant." Id. There was also evidence that the defendant's "high market share and the deeply rooted customer preference for [its] brand of paper prevent merchants from surrendering [the defendant] as a supplier, which they must do under these agreements if they desire to distribute non-Appleton brands." Id. Finally, "major distributors have agreed among themselves that they will remain loyal to Appleton carbonless sheets regardless of competitors' pricing or product innovations." Id. Based on these four showings, the district court denied the defendant's motion for summary judgment on the plaintiff's exclusive dealing claims. See also United States v. Dentsply Int'l, Inc., 2001-1 Trade Cas. (CCH) P73,247 (D. Del. 2001) (denying summary judgment motion on exclusive dealing claims despite the fact that the agreements at issue were terminable at will).

Plaintiff argues that similarly, the "practical effect" of the EDAs is to bind individual member banks to a particular Visa

or MasterCard for longer than permitted by the Court's order in United States v. Visa. Plaintiff explains that "[d]islodging banks from dedication agreements is likely to be particularly difficult where, as here, the parties who have conspired so effectively and for so long to boycott American Express will necessarily have a continuing incentive to accomplish the same end by other means." (P. Opp. at 11.)

The Court agrees that dismissal would be inappropriate based on the terminablility of the EDAs because it remains to be seen whether the EDAs are, in fact, terminable at will. The practical ramifications considered by the court in 3M are important ones, even more so given that the motion before the Court is one to dismiss on the pleadings, rather than one for summary judgment. Moreover, under the rule of reason analysis applicable to Plaintiff's exclusive dealing claim, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited.'" K.M.B. Warehouse Distrib., Inc. v. Walker Mfg. Co., 61 F.3d 123, 127 (2d Cir. 1995) (quoting Continental T. V. v. GTE Sylvania, 433 U.S. 36, 49, 97 S. Ct. 2549 (1977)). Therefore a single factor – the terminability of the agreements – cannot outweigh all the other factors the Court must consider, particularly not at this early pleading stage. See Am. Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230 at 1252 (reversing where the district court

failed to engage in the "broad inquiry" required under Tampa Elec.). Accordingly, the Bank Defendants' motion to dismiss Plaintiff's exclusive dealing claim based on the terminability of the EDAs is denied.

**Conclusion**

For the reasons stated above, the Bank Defendants' motion to dismiss Plaintiff's fifth claim for restraint of trade, grounded on the EDAs, is denied.

**SO ORDERED:**

_____
BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Dated:   New York, New York
         June 23, 2005